Dewey HEALING, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on Behalf of the Hopi Indian Tribe, Including All Villages and Clans Thereof, and on Behalf of Any and All Hopi Indians Claiming Any Interest in the Lands Described in the Executive Order Dated December 16, 1882, Plaintiff,

v.

Paul JONES, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe for and on Behalf of the Navajo Indian Tribe, Including All Villages and Clans Thereof, and on Behalf of Any and All Navajo Indians Claiming Any Interest in the Lands Described in the Executive Order Dated December 16, 1882; Robert F. Kennedy, Attorney General of the United States, on Behalf of the United States, Defendants.

Civ. No. 579.

United States District Court
D. Arizona.

Sept. 28, 1962.

See also, 174 F.Supp. 211.

128

John S. Boyden, Allen H. Tibbals and Bryant H. Croft, Salt Lake City, Utah, for plaintiff.

Norman M. Littell, Washington, D. C., Joseph F. McPherson and Walter F. Wolfe, Jr., Window Rock, Ariz., for defendant.

Charles A. Muecke, U. S. Atty., Phoenix, Ariz., Mary Anne Reimann, Asst. U. S. Atty., Phoenix, Ariz., for the United States.

Before HAMLEY, Circuit Judge, and YANKWICH and WALSH, District Judges.

HAMLEY, Circuit Judge.

We have for determination in this action the conflicting claims of the Hopi and Navajo Indians in and to Indian reservation lands situated in northeastern Arizona.

These lands, consisting of some 2,500,000 acres, or 3,900 square miles, were withdrawn from the public domain under an executive order signed by President Chester A. Arthur on December 16, 1882. In that order it was provided that this rectangular tract, about seventy miles long and fifty-five miles wide, hereinafter referred to as the 1882 reservation,

would be " \* \* \* for the use and occupancy of the Moqui, and such other Indians as the Secretary of the Interior may see fit to settle thereon." [1]

The Hopi Indian Tribe has long contended that it has the exclusive beneficial interest in all of the 1882 reservation for the common use and benefit of the Hopi Indians, trust title being conceded to be in the United States. The Navajo Indian Tribe contends that, subject to the trust title of the United States, it has the exclusive interest in approximately four-fifths of the 1882 reservation for the common use and benefit of the Navajo Indians, and concedes that the Hopi Indian Tribe has the exclusive interest in the remainder. The controversy resulting from these conflicting claims presents what has been characterized as "the greatest title problem of the West."

Over a period of many years efforts have been made to resolve the controversy by means of agreement, administrative action, or legislation, all without success. The two tribes and officials of the Department of the Interior finally concluded that resort must be had to the courts. This led to the enactment of the Act of July 22, 1958, 72 Stat. 403.[2]

1. The "Hopi" and the "Moqui" are one and the same Indian people. The "Navajo" and the "Navaho" are one and the same Indian people. The Executive Order of December 16, 1882, reads as follows:

"Executive Mansion,
"December 16, 1882.

"It is hereby ordered that the tract of country, in the territory of Arizona, lying and being within the following described boundaries, viz: beginning on the one hundred and tenth degree of longitude west from Greenwich, at a point 36° 30' north, thence due west to the one hundred and eleventh degree of longitude west, thence due south to a point of longitude 35° 30' north; thence due east to the one hundred and tenth degree of longitude west, thence due north to the place of beginning, be and the same is hereby withdrawn from settlement and sale, and set apart for the use and occupancy of the Moqui, and such other Indians as the Secretary of the Interior may see fit to settle thereon.

"CHESTER A. ARTHUR"

2. The Act of July 22, 1958, reads as follows:
"Public Law 85–547
"AN ACT
"To determine the rights and interests of the Navaho Tribe, Hopi Tribe, and individual Indians to the area set aside by Executive order of December 16, 1882, and for other purposes.
"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That lands described in the Executive order dated December 16, 1882, are hereby declared to be held by the United States in trust for the Hopi Indians and such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior pursuant to such Executive order. The Navaho Indian Tribe and the Hopi Indian Tribe, acting through the chairmen of their respective tribal councils for and on behalf of said tribes, including all villages and clans thereof, and on behalf of any Navaho or Hopi Indians claiming an interest in the area set aside by Executive order dated December 16, 1882, and the Attorney General on behalf of the United States, are each hereby authorized to commence or defend in the United States District Court for the District of Arizona an action against each other and any other tribe of Indians claiming any interest in or to the area described in such Executive order for the purpose of determining the rights and interests of said parties in and to said lands and quieting title thereto in the tribes or Indians establishing such claims pursuant to such Executive order as may be just and fair in law and equity. The action shall be heard and determined by a district court of three judges in accordance with the provisions of title 28 United States Code, section 2284, and any party may appeal directly to the Supreme Court from the final determination by such three judge district court.

"SEC. 2. Lands, if any, in which the Navaho Indian Tribe or individual Navaho Indians are determined by the court to have the exclusive interest shall thereafter be a part of the Navaho Indian Reservation. Lands, if any, in which the Hopi Indian Tribe, including any Hopi village or clan thereof, or individual Hopi Indians are determined by the court to have exclusive interest shall thereafter be a reservation for the Hopi Indian Tribe. The Navaho and Hopi Tribes, respectively, are authorized to sell, buy, or exchange any lands within their reservations, with the approval of the Secretary

The 1958 act authorized the chairmen of the tribal councils of the respective tribes, and the Attorney General on behalf of the United States, to commence or defend an action against each other and any other tribe of Indians claiming any interest in or to the 1882 reservation. As indicated in section 1 of the act, the purpose of any such action would be to determine the rights and interests of these parties in and to the lands and to quiet title thereto in the tribes or Indians "establishing such claims pursuant to such Executive order as may be just and fair in law and equity."

With respect to any interest which either tribe or the Indians thereof might be thus found to have in any of the lands, it was provided, in section 2, that the court would determine whether such interest is exclusive or otherwise. Under that section, lands in which either tribe or the Indians thereof are determined to have the exclusive interest shall thereafter, in the case of the Navajos, "be a part of the Navaho Indian Reservation," and, in the case of the Hopis, "be a reservation for the Hopi Indian Tribe."

Under section 1 of the 1958 act, any such action was required to be heard and determined by a district court of three judges convened and functioning in accordance with the provisions of 28 U.S.C. § 2284, with the right in any party to take a direct appeal to the Supreme Court from the final determination by such district court.

Proceeding under this act, Willard Sekiestewa, then the duly authorized chairman of the Hopi Tribal Council of the Hopi Indian Tribe, commenced this action on August 1, 1958. He did so for and on behalf of the Hopi Indian Tribe including all villages and clans thereof, and on behalf of any and all Hopi Indians. Sekiestewa has since been succeeded, as

chairman of the Hopi Tribal Council by Dewey Healing, and the latter has been substituted as party plaintiff.

Two defendants were named in the complaint. One is Paul Jones, the duly authorized chairman of the Navajo Tribal Council of the Navajo Indian Tribe, including all villages and clans thereof, and on behalf of any and all Navajo Indians claiming any interest in the 1882 reservation.

The other defendant named in the complaint is William P. Rogers, then Attorney General of the United States, on behalf of the United States. Rogers has since been succeeded, as Attorney General, by Robert F. Kennedy. The latter has been automatically substituted for Rogers as a party defendant by operation of Rule 25(d) Federal Rules of Civil Procedure, 28 U.S.C.A.

Upon the filing of the complaint a district court of three judges was duly constituted in accordance with the provisions of § 2284 referred to above. One change was subsequently made in the personnel thereof, as noted in our previous opinion, Healing v. Jones, D.C., 174 F.Supp. 211, decided May 25, 1959. The court is now comprised of the judges named above.

Defendant Jones filed an answer, counterclaim and cross-claim. The Attorney General filed an answer in which two defenses were asserted.

Under the 1958 act, the parties authorized to institute this litigation were empowered to name, as defendants, in addition to each other, "any other tribe of Indians claiming any interest in or to the area described in such Executive order * * *." The court has been advised by counsel that exhaustive studies and investigations conducted by field workers, historians and anthropologists have failed to reveal that any Indians or

of the Interior, and any such lands acquired by either tribe through purchase or exchange shall become a part of the reservation of such tribe.

"SEC. 3. Nothing in this Act shall be deemed to be a congressional determination of the merits of the conflicting tribal

or individual Indian claims to the lands that are subject to adjudication pursuant to this Act, or to affect the liability of the United States, if any, under litigation now pending before the Indian Claims Commission.

"Approved July 22, 1958."

Indian tribes other than Hopis and Navajos have or claim any interest in any part of the 1882 reservation. Consequently the parties to this action, named above, did not join, as defendants, any other Indian or Indian tribe. Nor has any other Indian or Indian tribe sought to intervene or otherwise participate in this action, notwithstanding the fact that the pendency of this litigation has been given widespread publicity throughout the affected area.

One of the defenses set out in the answer of the United States is that this court is without jurisdiction because the rights and interests to be determined herein assertedly present a political and not a judicial question. Pursuant to Rule 12(d), Federal Rules of Civil Procedure, 28 U.S.C.A., and upon the motion of plaintiff, a hearing was first had on this defense challenging the jurisdiction of the court.

At this hearing plaintiff and defendant Jones opposed the position of the Government and argued that the court had jurisdiction. We decided that this court had jurisdiction to hear and determine the action. The first defense of the United States was accordingly dismissed. Healing v. Jones, 174 F.Supp. 211. At the same hearing certain motions directed to the pleadings were argued and later disposed of as indicated in the opinion just cited.[3]

Extensive pretrial proceedings were thereafter had, including pretrial conferences on March 16, 1959 and August 18, 1960. The parties exchanged documents, submitted documents for identification, filed statements of contentions, and entered into stipulations concerning certain facts, issues of fact and law, and exhibits, all in advance of trial. It is provided in pretrial order No. 2, filed March 28, 1960, that pretrial orders Nos. 1 and 2 shall supersede all pleadings and render moot all motions then pending directed against the pleadings.

As set forth in the pretrial orders, and as explained during pretrial hearings, plaintiff claims that all of the lands described in the order of December 16, 1882, are held in trust by the United States exclusively for the Hopi Indians and that neither the Navajo Indian Tribe, and its villages, clans or individual members, nor any other Indian or Indian tribe, village or clan, has any estate, right, title or interest therein or any part thereof. Plaintiff seeks a decree of this court quieting title to all of these lands in the United States in trust exclusively for the Hopi Indians.

Plaintiff further claims that if (but not conceding) some Navajo Indians have been settled on the reservation lands in the manner provided in the order of December 16, 1882, rights and interests thereby acquired, if any, do not inure to the benefit of the Navajo Indian Tribe in general, or to Navajo Indians who have not been settled on the reservation, but only to the group of Navajo Indians actually settled therein and to their descendants, collectively. Plaintiff also claims that such rights and interests, if any, acquired by any such group of Navajo Indians, are not exclusive as to any part of the reservation area, but are coextensive with those of the Hopi Indians.

As set forth in the pretrial orders and explained during pretrial hearings, defendant concedes that the United States holds in trust for the Hopi Indians a portion of the executive order lands, described with particularity in pretrial order No. 2, and in paragraph 12 of the findings of fact herein. This tract, consisting of about 488,000 acres, is located in the south central part of the executive order reservation and includes the Hopi villages located on three mesas. Defendant claims that the remaining four-fifths of the 1882 reservation is held in trust by the United States exclusively for the Navajo Indian Tribe. In the map following this page of the opinion, the boundary

---

3. Unless otherwise indicated, references hereinafter to "defendant," will mean Paul Jones, Chairman of the Navajo Tribal Council, and references to the

"parties" will mean Dewey Healing and Paul Jones, representing the Hopi and Navajo Indians and Indian Tribes, respectively.

lines of the area which defendant concedes to plaintiff, and other boundary lines to be discussed in this opinion are depicted.

Defendant makes no claim on behalf of any member of the Navajo Indian Tribe or any Navajo Indian using or occupying, or who has or has had any claim of any right, title or interest in the use and occupancy of, any part, parcel or portion of the lands described in the order of December 16, 1882, except as beneficiary under the Navajo tribal claim. Defendant seeks a decree of this court quieting title to the lands in question in the United States in trust exclusively for the Hopi and Navajo Indian Tribes in accordance with his claims summarized above.

The second defense of the Attorney General is that the United States is a stakeholder with respect to the lands involved in this suit. For this reason, it was alleged, the Attorney General would take no position as between the claims of the other parties and would assert no claim on behalf of any other Indian or Indian tribe. Throughout the proceedings, after denial of its first defense, the Attorney General, represented by the office of the United States Attorney in Phoenix, Arizona has, consistent with its position as stakeholder, assumed the passive role of observer.

The cause came on for trial at Prescott, Arizona, on September 26, 1960, and continued without interruption to its conclusion on October 22, 1960. Proposed findings of fact and opening briefs were filed by both parties followed by objections to the proposed findings of the opposing party, and reply briefs. The case was taken under submission on August 2, 1961, when the last of these briefs were filed.

Concurrently with the filing of this opinion this court has entered its findings of fact, conclusions of law, and judgment herein.

■ In the judgment it is declared and adjudicated that, subject to the trust title of the United States, the Hopi Indian Tribe, for the common use and benefit of the Hopi Indians, has the exclusive interest in and to that part of the 1882 reservation lying within the boundaries of land management district 6, as defined on April 24, 1943, which area is described in the judgment and in paragraph 41 of the findings of fact and is depicted on the map which is a part of this opinion. Accordingly, and pursuant to section 2 of the Act of July 22, 1958, it is declared and adjudicated in the judgment that such area is a reservation for the Hopi Indian Tribe.

■ In the judgment it is further declared and adjudicated, subject to the trust title of the United States, that the Hopi Indian Tribe, for the common use and benefit of the Hopi Indians, and the Navajo Indian Tribe, for the common use and benefit of the Navajo Indians, have joint, undivided and equal interests in and to all of the 1882 reservation lying outside the boundaries of land management district 6 as defined on April 24, 1943. Accordingly, it is declared and adjudicated in the judgment that such area is a reservation for the joint use of the Hopi and Navajo Indian Tribes.

The judgment quiets title in and to the 1882 reservation lands in accordance with the declared rights and interests of the respective tribes.

In this opinion we will discuss the principal questions of fact and law which have been resolved by the findings of fact, conclusions of law, and judgment which we have entered. A chronological account of the Hopi-Navajo controversy, added as an appendix to this opinion, contains marginal references to the record.

The rights and interests in the reservation lands, as declared and adjudicated herein, derive from the Executive Order of December 16, 1882, and from events which thereafter occurred. In this discussion we will first consider what rights and interests, if any, were acquired by the two tribes and their respective members as a result of the December 16, 1882 order standing alone. We will then discuss the extent to which any such rights and interests were enlarged or

**L E G E N D**

▨▨▨▨ 1882 Executive Order Area: A rectangle of land approximately 70 miles north to south and 57 miles east to west. The north boundary line is located approximately 34 miles south of the Arizona-Utah state line and the eastern line is 54 miles west of the Arizona-New Mexico state line. The northeast corner of the Executive Order Area is approximately 63 miles WSW from the Four-Corner Monument marking the corner common to Arizona, New Mexico, Colorado, and Utah.

—·—·— Boundary conceded by the Navajo to be Hopi.

————— Boundary of Land Management District 6 as originally created in 1936.

— — — Boundary of Land Management District 6 as approved April 24, 1943.

Note: This map represents a simplified version of one in larger scale filed in the records of the case pursuant to stipulation of counsel for the parties dated August 15, 1962.

diminished, and similar rights, if any, were newly created, by reason of events occurring after that date.

### Rights and Interests Acquired by Hopis on December 16, 1882

It has been the consistent position of the Hopis from the outset of this litigation that the rights which they assertedly have in the reservation arise from the 1882 executive order standing alone, and are in no sense dependent upon a showing that they have been settled in the reservation by authority of the Secretary of the Interior.

On the tentative assumption that the Hopis were correct in this it was ordered, during the pretrial proceedings, that, at the trial, the Navajos should proceed first with their case. It was further ordered

that the question of whether the Hopis must, in order to establish their claim, prove they were settled in the reservation by the Secretary, would be argued and decided during the course of the trial after the basic evidence had been received but while there was still opportunity for the Hopis to produce additional evidence. This procedure was followed and during the trial the court ruled from the bench, after argument and conference, that whatever rights the Hopi Indians may have gained in and to the 1882 reservation are not dependent upon a showing that they had been settled therein by permission of the Secretary.

Defendant has asked us to reconsider this ruling and we have done so.

Such reconsideration logically begins with an analysis of the language of the Executive Order of December 16, 1882. It is recited in that order that the lands therein described are set apart "for the use and occupancy of the Moqui, and such other Indians as the Secretary may see fit to settle thereon."

In the quoted clause the "Moqui" Indians are specifically named, a comma appears after the word "Moqui," and there is no comma after the word "Indians." This specific reference to the Hopis, and the punctuation, indicate that the words "as the Secretary may see fit to settle thereon," do not apply to the Hopi Indians, but only to "such other Indians." Under this construction the Hopis would appear to have acquired immediate rights and interest in and to the 1882 reservation, without the need of any Secretarial action permitting them to "settle" on the reservation.

The language is not ambiguous in this regard and therefore reference to extrinsic aids to construction, such as the factual setting in which the 1882 order was issued, hardly seems necessary. We have nevertheless examined the evidence pertaining thereto and now state the background facts pertaining to the establishment of this reservation.

No Indians in this country have a longer authenticated history than the Hopis. As far back as the Middle Ages the ancestors of the Hopis occupied the area between Navaho Mountain and the Little Colorado River, and between the San Francisco Mountains and the Luckachukas. In 1541, a detachment of the Spanish conqueror, Coronado, visited this region and found the Hopis living in villages on mesa tops, cultivating adjacent fields, and tending their flocks and herds.[4]

The level summits of these mesas are about six hundred feet above the surrounding sandy valleys and semi-arid range lands. The village houses, grouped in characteristic pueblo fashion, were made of stone and mud two, three, and sometimes four stories high. Water had to be brought by hand from springs at the foot of each mesa.

The Hopis were a timid and inoffensive people, peaceable and friendly with outsiders. They were also intelligent and industrious although their working time was frequently interrupted by lengthy religious ceremonials and exhausting tribal dances. A government agency, with headquarters at Keams Canyon, twelve miles east of the nearest Hopi village, was established for the Hopis in 1863. They had no reservation prior to December 16, 1882, at which time they numbered about eighteen hundred.

The recorded history of the Navajos does not extend as far back as that of the Hopis. They are mentioned in preserved journals for the first time in 1629. From all historic evidence it appears that the Navajos entered what is now Arizona in the last half of the eighteenth century. By 1854 there were at least eight thousand Navajos residing on the tributaries of the San Juan River, west of the Rio Grande and east of the Colorado, and

4. In 1692 another Spanish officer, Don Diego De Vargas, visited the area where he met the Hopis and saw their villages. American trappers first encountered the Hopis in 1834. In 1848, by the Treaty of Guadalupe Hidalgo, 9 Stat. 922, this area came under the jurisdiction of the United States.

between the 35th and 37th parallels of north latitude.

In 1863, Col. Christopher ("Kit") Carson, led a force which rounded up several thousand Navajos and interned them at Bosque Redondo, on the Pecos River, near Fort Sumner, in New Mexico. In 1868, the United States entered into a treaty with the Navajos (15 Stat. 667), under which the latter were granted an extensive reservation to the east of what was to become the executive order reservation of December 16, 1882. The Navajos were thereupon released from their internment and moved to the newly-created Navajo Indian Reservation. Added to those who had escaped internment there were then between twelve and thirteen thousand Navajos. By 1882 the population of the Navajos had grown to about sixteen thousand.

The western boundary of the Navajo Indian Reservation was defined with precision in an executive order issued on October 29, 1878. This line was later to become the eastern boundary of the 1882 reservation. Additional land was added to the southwest corner of the Navajo reservation by another executive order issued on January 6, 1880. With this addition, the Navajo reservation amounted to about 11,875 square miles, or 8,000,000 acres.

Despite the vast size of the Navajo reservation at that time, this semi-arid land was considered incapable of providing support for all of the Navajos. Moreover, except for one or two places, the boundaries of the Navajo reservation were not distinctly marked. It is therefore not surprising that great numbers of the Navajos wandered far beyond the paper boundaries of the Navajo reservation as it existed in 1880. By 1882, Navajos comprising hundreds of bands and amounting to about half of the Navajo population had camps and farms outside the Navajo reservation, some as far away from it as one hundred and fifty miles.

The Navajos were originally of an aggressive nature, although not as warlike as the Apaches. It was because they had become embroiled in a series of fights with white men that they were banished to Fort Sumner in 1863. By 1882, however, they had curbed their hostility to the Government and to white men and, in general, were peaceably disposed, except for their proclivity to commit depredations against the Hopis, as described below.

Desert life made the Navajos sturdy, virile people, industrious and optimistic. They were also intelligent and thrifty. Some Navajos established farms which held them to fixed locations. In the main, however, they were semi-nomadic or migratory, moving into new areas at times, and then moving seasonally from mountain to valley and back again with their livestock. This required them to live in rude shelters known as "hogans," usually built of poles, sticks, bark and moist earth. It was their practice to keep these hogans on a permanent basis and return to them when it was practicable.

The first suggestion that a reservation be created which would include any of the lands here in question came from Alex G. Irvine, United States Indian Agent at Fort Defiance, Arizona Territory. On November 14, 1876, he recommended to John A. Smith, Commissioner of Indian Affairs of the Department of the Interior, that a reservation of fifty square miles be set apart for the Hopis. He based this recommendation on the necessity of protecting the Hopis from Mormon pressure from the west and south, and of providing more living space for the Hopis because of increasing Hopi and Navajo population.

Nothing came of Irvine's recommendation. On May 13, 1878, William R. Mateer, then United States Indian Agent for the Hopis, proposed that a reservation extending at least thirty miles along the Colorado River be set apart for the Hopis. This proposal drew no reaction from the Washington office. In his annual report of August 24, 1878, Mateer recommended the removal of the Hopis to a point on the Little Colorado River which was outside of what later became the 1882 reservation. His stated reason

for making this suggestion was that the Navajos were spreading all over that country within a few miles of the Hopis and were claiming, as their own, the only areas where there was water and which were worth cultivating.

A year later Commissioner Ezra A. Hoyt asked Mateer to make a further report concerning the latter's reservation suggestion, but Mateer resigned before making such a report. On March 20, 1880, Galen Eastman, Mateer's successor as Hopi Indian Agent, wrote to R. E. Trowbridge, the then Commissioner, recommending that a reservation be set aside for the Hopis. His proposal was for a reservation forty-eight miles east to west and twenty-four miles north to south, embracing the Hopi villages. Eastman expressed the view that the Hopis needed a reservation because the settlement of Mormons in the vicinity was "imminent."

Nothing came of Eastman's recommendation and another two years were to pass before the matter of establishing a reservation in this area again became active. On March 27, 1882, J. H. Fleming, then the Hopi Indian Agent, wrote to the Secretary of the Interior recommending a small reservation for the Hopis. Such a reservation, he urged, should include the Hopi pueblos, the agency buildings at Keams Canyon, and sufficient lands for agricultural and grazing purposes. Fleming stated that such a reservation was needed to protect the Hopi Indians from the intrusion of other tribes, Mormon settlers, and white intermeddlers.

On July 31, 1882, United States Indian Inspector C. H. Howard wrote to the Secretary recommending that a new reservation be set aside for the "Arizona Navajos," and for the Hopis whose seven villages would be encompassed within the proposed new reservation. On October 25, 1882, Howard made an extensive report to the Secretary renewing his suggestion that a joint reservation be established for the western Navajos and Hopis.[5]

The reservation envisioned by Howard was a much larger one than Fleming had in mind. His stated reason for including the Arizona Navajos in the reservation was to contain, within newly-created boundaries, the great number of Navajos who were then roaming far beyond their then established reservation. His reasons for including the Hopis were to protect them from encroaching white settlers and from being "constantly overridden by their more powerful Navajo neighbors." [6]

None of the recommendations for the establishment of a new reservation were immediately acted upon. In the meantime, however, Fleming wrote to the Commissioner under date of October 17, 1882, advising that he had expelled one Jer. Sullivan from the Hopi villages as an intermeddler. At the same time he requested authority for soldiers to expel E. S. Merritt, another white intermeddler. Since, however, the Hopis did not have a reservation, forcible removal of intermeddlers could not be ordered, and Fleming was so advised.

On November 11, 1882, Fleming reported that he was having further difficulties with Sullivan, and stated that he would resign if a way could not be found to evict Sullivan and Merritt from the Hopi villages. On November 27, 1882, Commissioner Hiram Price sent a telegram to Fleming, asking him to describe the boundaries "for a reservation that will included Moquis villages and agency and large enough to meet all needful purposes and no larger. * * * "

5. A third Howard report, renewing this recommendation, was not completed until December 19, 1882, and so could not have been considered in drafting the Executive Order of December 16, 1882.

6. Howard's assertion that the Hopis were "constantly" overridden by the Navajos is borne out by authentic reports extending back to 1846. In that year and in 1850, 1856, 1858, and 1865, civil and military officials reported instances in which Navajos had trespassed upon Hopi gardens and grazing lands, seized and carried away livestock, and committed physical violence.

Fleming responded by letter dated December 4, 1882, specifying, as boundaries of the proposed reservation, the lines which were later described in the Executive Order of December 16, 1882. The proposed reservation thus described was much smaller than had been suggested in the joint-reservation proposal submitted by Howard.[7] At that time there were about eighteen hundred Hopis and about three hundred Navajos living within the boundaries recommended by Fleming.[8]

On December 13, 1882, Commissioner Price wrote to H. M. Teller, Secretary of the Interior, transmitting a draft of an executive order in the exact form of the order issued three days later. In his letter of transmittal Price pointed out that the Hopis, then said to comprise "1813 souls" had no reservation, as a result of which it had been found impossible to extend them needful protection from white intermeddlers.

On December 15, 1882, Secretary Teller forwarded the papers to President Arthur, stating that he concurred in the Commissioner's recommendation. The handwritten executive order of President Arthur, setting aside the reservation, was issued on the next day, the boundaries being depicted in the map which is a part of this opinion. On December 21, 1882, Price sent a telegram to Fleming advising:

"President issued order, dated sixteenth, setting apart land for Moquis recommended by you. Take steps at once to remove intruders."[9]

The circumstances which led to the issuance of this executive order, as stated above, demonstrate that the primary purpose was to provide a means of protecting the Hopis from white intermeddlers, Mormon settlers, and encroaching Navajos. It was thus intended that the Hopis would be provided such means of protection

7. In his letter of December 4, 1882, Fleming said, among other things:

"The lands most desirable for the Moquis, & which were cultivated by them 8 or 10 years ago, have been taken up by the Mormons & others, so that such as is embraced in the prescribed boundaries, is only that which they have been cultivating within the past few years. The lands embraced within these boundaries are desert lands, much of it worthless even for grazing purposes. That which is fit for cultivation even by the Indian method, is found in small patches here & there at or near springs, & in the valleys which are overflowed by rains, & hold moisture during the summer sufficient to perfect the growth of their peculiar corn.

\* \* \* \* \*

"In addition to the difficulties that have arisen from want of a reservation with which you are familiar, I may add that the Moquis are constantly annoyed by the encroachments of the Navajos, who frequently take possession of their springs, & even drive their flocks over the growing crops of the Moquis. Indeed their situation has been rendered most trying from this cause, & I have been able to limit the evils only by appealing to the Navajos through their chiefs maintaining the rights of the Moquis. With a reservation I can protect them in their rights & have hopes of advancing them in civilization. Being by nature a quiet and

peaceable tribe, they have been too easily imposed upon, & have suffered many losses."

8. As revealed by extensive archeological studies, there were over nine hundred old Indian sites, no longer in use, within what was to become the executive order area but outside of the lands where the Hopi villages and adjacent farm lands were located. Most of these were Navajo sites. Tree ring or dendrochronological studies show that of a total of 125 of these Indian sites within the executive order area for which data was successfully processed, the wood used in the structures was cut during a range of years from 1662 to 1939. A considerable number of these specimens were cut and presumably used in structures prior to 1882. There is no convincing evidence of any mass migration of Navajos either into or out of the executive order area at any time for which the tree ring data were available.

9. This was confirmed by a letter of the same date in which the Commissioner stated, among other things:

"I now transmit to you a copy of the order, by which you will see that your recommendations, as contained in letter to this office, dated December 4th (instant), have been followed as regards the boundaries of the same."

immediately upon the issuance of the executive order, no further proceedings by way of Secretarial settlement or otherwise being required. Hence the background facts fully confirm the opinion stated above, based on the language of the order, that the Hopis acquired immediate rights in the 1882 reservation upon issuance of the December 16, 1882 order.

▉ The right and interest thereby gained by the Hopis was the right to use and occupy the reservation, the title to the fee remaining in the United States. Spalding v. Chandler, 160 U.S. 394, 402–403, 16 S.Ct. 360, 40 L.Ed. 469. This included the right to the mineral resource as well as surface use and occupancy.[10] The right was in the Hopi Tribe for the use and benefit of individual members thereof.[11]

The right of use and occupancy then gained by the Hopi Indian Tribe extended to the entire area embraced within the December 16, 1882 reservation, and was not limited to the parts of that reservation then used and occupied by them. As indicated in Commissioner Price's telegram of November 27, 1882, the reservation was intended to "include Moquis villages and agency and large enough to meet all needful purposes and no larger. * * * " Future as well as then present needs of the Hopis were thus intended to be met, thereby precluding a construction of the executive order which would confine Hopis to the area which they then actually occupied.

Whether the right thus acquired by the Hopis to use and occupy the entire reservation was lost or impaired by subsequent inaction or abandonment on the part of the Hopi Indian Tribe is a matter to be discussed at a later point in this opinion. Likewise to be discussed below is the extent to which, if any, the right of use and occupancy acquired by the Hopis on December 16, 1882 was thereafter diminished in quantum or altered in character by action, if any, of the Secretary in permitting other Indians to settle on the reservation, or by reason of any other occurrence or course of events.

▉ The right of use and occupancy gained by the Hopi Indian Tribe on December 16, 1882, was not then a vested right. As stated in our earlier opinion, an unconfirmed executive order creating an Indian reservation conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President. Such use and occupancy may be terminated by the unilateral action of the United States without legal liability for compensation. The Hopis were therefore no more than tenants at the will of the Government at that time. See Healing v. Jones, 174 F.Supp. 211, 216, and cases there cited. No vesting of rights in the 1882 reservation occurred until enactment of the Act of July 22, 1958.

*Rights and Interests Acquired by Navajos on December 16, 1882*

Unlike the Hopis, the Navajos are not named in the Executive Order of December 16, 1882. Therefore if they have any rights of use and occupancy in the reservation such rights must have been acquired under the provision of that order reading: "and such other Indians as the Secretary may see fit to settle thereon."

The words "may see fit" connote a future contingency, to be fulfilled only by an exercise of discretion. Those words

10. Opinion of Acting Solicitor, Department of the Interior, filed June 11, 1946, 59 I.D. 248, dealing specifically with the executive order reservation of December 16, 1882. See, also, McFadden v. Mountain View M. & M. Co., 9 Cir., 97 F. 670, 673, reversed on other grounds, 180 U.S. 533, 21 S.Ct. 488, 45 L.Ed. 656; Gibson v. Anderson, 9 Cir., 131 F. 39; 34 Opinions of the Attorney General, 182, 189; Federal Indian Law, 1958 edition, pages 648–652. The applicable principles are discussed in United States v. Walker River Irr. District, 9 Cir., 104 F.2d 334.

11. United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213; Cherokee Nation v. Hitchcock, 187 U.S. 294, 307, 23 S.Ct. 115, 47 L.Ed. 183.

thus contemplate the exercise of Secretarial authority which did not come into existence until the executive order was issued.

In the exercise of that authority the Secretary might, sometime after December 16, 1882, permit to be settled in the reservation Navajos who were actually residing there when the executive order was issued. Conceivably the Secretary could, in his discretion, relate those rights back to the day the executive order was issued. But, in any event, rights thereby acquired would be predicated upon the act of the Secretary on some date subsequent to December 16, 1882, in granting such permission, nunc pro tunc or otherwise, and not upon the force and effect of the executive order independent of such Secretarial action.

Defendant appears to concede that any right or interest the Navajos have in the 1882 reservation must arise from Secretarial action pursuant to the "such other Indians" clause of the executive order.[12]

But it also appears to be defendant's position that the administrative intent in using this "such other Indians" clause was to grant immediate rights of use and occupancy to Navajos then living in the reservation area. Thus defendant expresses the view, in its objections to plaintiff's proposed findings of fact, that the recommendations of C. H. Howard for the establishment of a joint Western Navajo-Hopi reservation were accepted. Defendant also calls attention to official expressions in later years that it was the intention in creating the reservation to set aside the lands for the use and occupancy of the Hopi Indians and for the use and occupancy of the Navajos then living there, in addition to permitting the continued settlement of Navajos within the discretion of the Secretary.

There seems to be an inconsistency between defendant's concession that any

rights the Navajos have in the 1882 reservation result from the "such other Indians" clause of the executive order, and his contention that the purpose in issuing the order was to grant immediate rights to Navajos as well as Hopis. As previously pointed out, the "such other Indians" clause could only be effectuated by subsequent Secretarial action. Its only effect was to provide the Secretary with authority to take future action, in his discretion, permitting Indians other than Hopis to settle on the reservation. Indians whose rights in the reservation are dependent upon future official acts of discretion can hardly be said to have gained immediate rights by virtue of an executive order which authorizes the exercise of such discretion.

But aside from this seeming inconsistency, and apart from the conclusion expressed above that the words of the executive order disclose no such intention, the extrinsic evidence refutes, rather than supports, the argument that it was intended by the executive order to grant Navajos immediate rights in the 1882 reservation.

As stated above, J. H. Fleming had recommended a small reservation for the exclusive use of the Hopis while C. H. Howard had recommended a very much larger reservation for the joint use of the "Arizona Navajos," and the Hopis. Defendant contends that since the Secretary was expressly authorized to settle other Indians in the reservation, Fleming's recommendation for an exclusive Hopi reservation was necessarily rejected. Defendant also calls attention to the fact that in his letter of December 21, 1882, the Secretary advised Fleming that his recommendations "as regards the boundaries" had been accepted, nothing being said of Fleming's recommendations that the reservation be for the exclusive use of the Hopis. It is argued from these

---

12. In defendant's reply brief, for example, it is stated that "The 'Navajo interest' in the Executive Order area necessarily arises from Secretarial settlement thereon of Navajo Indians, members of the Navajo Tribe." Later in the same brief defendant states: "We are quite certain the court will find that the Navajo Indians are those referred to in the Executive Order as having been 'settled thereon by the Secretary of the Interior pursuant to such Executive Order.'"

two circumstances that Howard's recommendation for a joint Arizona Navajo-Hopi reservation was accepted.

In our view, the conclusion reached by defendant is not warranted by the circumstances relied upon. The most significant fact in connection with the creation of the 1882 reservation is that the boundaries described in the executive order were those which Fleming supplied in response to the instruction: "for reservation that will include Moquis villages and agency and large enough to meet all needful purposes and no larger." Had administrative officials intended to create a joint Western Navajo-Hopi reservation they would not have confined it to an area which Fleming thought was no larger than necessary for the Hopis, and rejected the larger area recommended by Howard for a joint reservation.

It is true that Fleming's recommendation for an exclusive Hopi reservation was not completely accepted. It was rejected to the extent that the Secretary was authorized to settle other Indians in the reservation in the future. This explains why Fleming was advised that his recommendations "as regards the boundaries" had been accepted, no like advice being given with respect to his recommendation for an exclusive Hopi reservation. But this falls far short of establishing an intention to accept Howard's reommendation for a joint reservation from the outset. The latter possibility is negated not only by the fact that Fleming's restricted area recommendation was accepted, but by the fact that the Navajos were not named in the executive order.

It is probable that Howard's recommendations had nothing whatever to do with the insertion of the "such other Indians" clause in the executive order. This was a customary provision in executive orders of that period. In 1 Ex. Order 195, I Kappler 916, dated April 9, 1872, a reservation was set aside for named bands of Indians in Washington Territory, "and for such other Indians as the Dept. of Interior may see fit to locate thereon." Between that date and December 16, 1882, as shown by plaintiff's exhibit No. 263, nine additional orders, setting aside reservations for named Indian tribes, contained a similar provision.

On the other hand, when it was decided to give immediate reservation rights to specific Indians then residing in the area, in addition to the name Indians for whom the reservation was principally created, officials knew how to make this clear in an executive order. Just four days prior to the issuance of the order of December 16, 1882, an executive order was issued establishing the Gila Bend reservation. It was therein recited that the reservation was created for the " * * * Papago *and other Indians now settled there,* and such other Indians as the Secretary of the Interior may see fit to settle thereon." (Emphasis supplied.) The treaty of 1838 with the New York Indians, 7 Stat. 550, provided that the Senecas should have, "For themselves and their friends, the Cayugas and Onondagas, residing among them, the easterly part of the tract set apart for the New York Indians." [13]

There is another circumstance, extrinsic to the 1882 executive order itself, which tends to indicate that it was not the purpose to grant immediate rights to the Navajos by issuance of that order. By the Navajo treaty of 1868, 15 Stat. 667, the Navajos agreed that they would relinquish all right to occupy any territory outside the reservation thereby created, retaining only the right, under limited circumstances, to hunt on contiguous unoccupied lands.

13. A similar technique has been employed since 1882, when it was intended that Indians other than the primary tribe were to have immediate rights. In II Executive Order 7, IV Kappler 1003, dated July 17, 1917, the Kaibab Indian reservation was established, "For the use of the Kaibab and other Indians now residing thereon, and for such other Indians as the Secretary of the Interior may locate thereon."

The Navajos were released from this undertaking to the extent that specifically described additions were made to the original Navajo reservation by executive orders issued on October 29, 1878, and January 6, 1880.[14] Had it been the intention of the administration to grant Navajos, by issuance of the 1882 order, an immediate further release from their treaty obligations, we would expect to find some mention of the Navajos in that order.

We have not lost sight of defendant's reliance upon official expressions of opinion, made at various times, subsequent to

14. The Navajos were similarly released from this treaty obligation on several occasions subsequent to December 16, 1882, but again, in each case, specific reference was made to the Navajo Indians and their then-existing reservation. On May 17, 1884, President Chester A. Arthur withheld from sale and settlement as a reservation for Indian purposes, lands that later were added to the Navajo Indian Reservation. Act of June 14, 1934, 48 Stat. 960. Similar action was taken by President William McKinley on January 8, 1900, and by President Theodore Roosevelt, on November 14, 1901, both of these additions to the Navajo Indian Reservation being effectuated by the Act of June 14, 1934, supra. On November 9, 1907, the Navajo Indian Reservation was again enlarged by executive order.

15. The principal statements of this kind were the following: (1) In his 1912 annual report, Leo Crane, then Superintendent of the Hopi Reservation, stated: "* * * These Navajos were permitted to remain on the reservation, having a right of occupancy, when the reserve was created by executive order of December 16, 1882."; (2) in his letter of · June 22, 1914, addressed to the Commissioner of Indian Affairs, Superintendent Crane stated: "* * * Those Navajoes who resided on the reserve at that time (December 16, 1882), had a right of occupancy, and it is not understood that this right has diminished."; (3) in his letter of July 7, 1915, addressed to the Commissioner, Superintendent Crane stated: "* * * Owing to the language of the Executive Order creating the reservation in 1882, it would seem there is no authority for the deportation of Navajoes, nor is there any location to which they might be deported.

1882, with regard to the administrative intention in creating that reservation. In its briefs defendant relies upon two statements of this kind. One of these was the statement of Superintendent Leo Crane in his report of March 12, 1918. The other was the statement of Acting Solicitor Felix N. Cohen, in his opinion of June 11, 1946, 59 I.D. 248, 252. But there were also many other similar official expressions to the effect that it was the intention, in establishing the 1882 reservation, to give Navajos then living in the described area, rights of use and occupancy co-equal with those granted the Hopis.[15] On the other hand there are a

* * *"; (4) in the report made by Inspector H. S. Traylor to the Bureau of Indian Affairs, on June 6, 1916, he stated: "* * * The Navajos were the occupants of at least a part of this territory before the Executive Order was made, and there is no doubt but that they are entitled to a part at this time * * *" (In this report Traylor incorrectly paraphrases the executive order as follows: "* * * it was done for the exclusive use of the Hopis and such other Indians as may be residing there * * *"); (5) in a report dated March 12, 1918, from Superintendent Crane to the Commissioner of Indian Affairs, the Superintendent stated: "The language of the executive order of 1882 practically guarantees to those Navajos or other Indians residing on Moqui at that time equal rights with the Hopi."; (6) on May 18, 1920, during the testimony of Robert E. L. Daniel, Superintendent of the Hopi Reservation, before a subcommittee of the Committee of Indian Affairs of the U. S. House of Representatives, the following colloquy occurred: "Mr. Daniel. The reservation was created by Executive order for the Hopi Indians, and the usual jigger in all matters pertaining to Indian reservations slipped in in the form of 'such other Indians that might belong on the reservation,' (an erroneous paraphrase of the order). Mr. Carter. That lets the Navajo in? Mr. Daniel. That lets the Navajo in. It happened at that time that there were practically as many Navajos on the reservation as Hopis," (this was not a correct statement, as there were about eighteen hundred Hopis and three hundred Navajos in the reservation area in 1882).; (7) under date of July 26, 1924, the chief of the land division of the Department of the Interior, sent a memorandum to the inspec-

number of official expressions to the contrary effect.[16]

tion office of that department, in which it was said: "* * * the order of 1882 would seem to include them (the Navajos), or at least those who were there at that time."; (8) in a letter dated September 29, 1924, sent by Charles H. Burke, Commissioner of Indian Affairs, to several Hopi leaders, it was stated: "It is believed this language (of the executive order) was intended to permit Navajo Indians who had lived on the reserve for many years to continue there."; (9) in a report dated May 12, 1928, sent to the Commissioner of Indian Affairs by C. E. Faris, District Superintendent of the Southern Pueblo Agency at Albuquerque, New Mexico, it was said: "* * * with the establishment of the reserve in 1882, the Department and the President, not unmindful of the rights of the Navajos as well as the Hopis, created the reservation for the use and occupancy of the Hopis and 'such other Indians as the Secretary may see fit to settle thereon,' and since the Navajos were there in possession, control, and use of vast range areas, the provision was warranted."; (10) in a letter dated September 24, 1932, sent to Otto Lomavitu, then President of the Hopi Council at Oraibi, C. J. Rhoads, then Commissioner of Indian Affairs, said: "This language 'for the use and occupancy of the Moqui and such other Indians, etc.' was purposely used so as to not only provide a reservation for the Hopi (Moqui) Indians but also to take care of a large number of Navajo Indians who were then living within the Executive Order area, as reports on which the Executive Order withdrawal was based indicate that the purpose of the withdrawal was for the joint benefit of the Hopi and Navajo Indians living within the area."; (11) in a memorandum to the Secretary, dated December 20, 1932, Commissioner Rhoads said: "* * * At the time of making the above Executive Order withdrawal it was indicated by the Government field officers in their reports that in addition to the Hopi Indians a considerable number of the Navajo Indians were living within the area withdrawn. Hence, the language used in the Executive Order was designed to take care of the rights of both groups of Indians in their joint use and occupancy of the lands."; (12) in a conference between leaders of the Hopi Indians and officers of the Office of Indian Affairs, held on April 24, 1939, John Collier, Commissioner of Indian Affairs, stated that "* * * the Hopi-Navaho

Reservation [was] set aside by the President for the Hopis and other Indians resident there. * * *"; (13) in an opinion rendered to the Secretary on June 11, 1946, Felix S. Cohen then acting solicitor of the department, stated: "* * * it was the intention in creating the reservation to set aside the lands for the use and occupancy of the Hopi Indians and for the use and occupancy of the Navajos then living there, and to permit the continued settlement of Navajos within the area in the discretion of the Secretary * * *."

16. The principal statements of this kind are: (1) On October 10, 1888, R. V. Belt, then Chief of the Indian Division, advised the Secretary that the reservation "* * * comprises no lands set apart for the Navajoes * * *"; (2) on the same date the Secretary of the Interior, William F. Vilas, wrote to the Secretary of War, giving the identical advice; (3) on December 18, 1890, the Commissioner wrote to the Secretary: "It is very desirable that the Navajos should be forced to retire from the Moqui reservation * * *" (4) on February 10, 1912, C. F. Hauke, then Second Assistant Commissioner of Indian Affairs, writing to Leo Crane, then Superintendent of the Hopi Indian School at Keams Canyon, Arizona, said: "In considering the proposition for a division of the reservation, due weight should be given to the fact that the reservation was created primarily for the Moqui (Hopi) Indians, though it was also provided that the Secretary of the Interior might in his discretion settle other Indians thereon."; (5) during hearings before a subcommittee of the Committee on Indian Affairs of the U. S. House of Representatives, held on December 6, 1917, E. B. Merritt, Assistant Commissioner of Indian Affairs, stated: "* * * we have not considered seriously the question of excluding the Navajos from the area set aside primarily for the Moqui Indians."; (6) in a report, dated July 25, 1930, sent by H. H. Fiske, field representative of the Indian Service, to the Commissioner, commenting upon Superintendent Crane's report of March 12, 1918, in which it was stated that the executive order "practically guarantees to those Navajos or other Indians residing on Moqui at that time, equal rights with the Hopis," Fiske said: "* * * There is nothing in the wording of the Executive Order to indicate that time of residence had anything to do with the ques-

ing from officials of the same agency in the course of their administrative duties, are not competent evidence of what other officials, back in 1882, intended when they framed and obtained issuance of the executive order. Probably none of those commenting officials had access to as complete a record concerning the events and circumstances leading up to issuance of the 1882 order as is now before this court. As indicated by the words which they used in making these comments, several of these officials were apparently unaware of the exact language of that order. We must draw our own conclusions based on our understanding of the facts as they have been presented in this case, on our analysis of the language of the order, and on our view of the applicable law.[17]

█ Our conclusion, based on all of the considerations discussed above, is that neither the Navajo Indian Tribe nor any individual Navajo Indians, whether or not living in the reservation area in 1882, gained any immediate rights of use and occupancy therein by reason of the issuance of the executive order.

### Settlement of Navajos in the 1882 Reservation

It follows from what has just been said that if the Navajos have acquired any right or interest in that reservation it must have been because, subsequent to December 16, 1882, they were settled therein pursuant to the applicable provision of the executive order of that date.[18] The exact language of the provision in question reads as follows: " * * * and such other Indians as the Secretary of the Interior may see fit to settle thereon."

In discussing the meaning of this provision, defendant directs attention to the character of the occupancy which must be shown to exist in order to establish that "other" Indians were settled in the reservation. Indians other than the Hopis are to be regarded as settled in the reservation, he argues, if they use and occupy such lands for residential and incidental purposes, in Indian fashion, and if such use and occupancy is of a continuing and permanent nature as opposed to a transitory or temporary occupancy.

In reaching this conclusion defendant applies, by analogy, the meaning which courts have attached to the terms "settlement" and "settled" as used in the Homestead Law, 43 U.S.C. §§ 162, 166.[19] He also likens the character of use and occupancy by "other Indians" contemplated by the executive order to that which must be found to exist in order to establish aboriginal Indian title.[20] De-

---

tion; but that the Secretary of the Interior might introduce such Indians, of tribes other than the Hopis, as he might see fit to do from time to time."

17. These post-1882 official comments and opinions may be relevant to the entirely different question of whether Navajos were later settled in the reservation with the permission of the Secretary.

18. It was theoretically possible for the Navajos to have acquired an interest in the reservation subsequent to December 16, 1882, by some other means, such as by Presidential or Congressional action. However, the Navajos make no claim of that kind, nor would the record support such a claim. Moreover, the Act of July 22, 1958, negates any such claim. In the opening language of that act it is declared that the lands are held in trust for the Hopi Indians "and such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior

pursuant to such Executive order." The statutory trust therefore is not for the benefit of any unnamed Indians who were not "settled" in the reservation pursuant to the "such other Indians" provision of the executive order.

19. The Supreme Court in Great Northern Railroad Company v. Reed, 270 U.S. 539, 545, 46 S.Ct. 380, 382, 70 L.Ed. 721, speaking of the Homestead law, said: "The term 'settlement' is used as comprehending acts done on the land by way of establishing or preparing to establish an actual personal residence—growing thereon and, with reasonable diligence, arranging to occupy it as a home to the exclusion of one elsewhere." See also, Anna Bowes, 32 L.D. 331.

20. In this connection defendant refers to statements concerning the kind of aboriginal use and occupancy which will constitute "Indian title," as set out in United States v. Santa Fe Pacific Railroad Com-

fendant thus seems to make the test exclusively one as to the character of the use and occupancy, no mention being made of the role the Secretary must play in order for "other Indians" to obtain rights as settled Indians.

Plaintiff, on the other hand, places the emphasis entirely upon the part the Secretary must play. He argues that however continuing and permanent the use and occupancy of other Indians may be, they cannot acquire rights in the 1882 reservation as "settled" Indians, unless the Secretary has, in the exercise of his discretion, "settled" them in the reservation. Plaintiff contends that neither the meaning attached to the terms "settlement" or "settled," as used in the Homestead law,[21] or the character of use and occupancy associated with aboriginal Indian title, is helpful in construing the words "to settle," as used in the Executive Order of December 16, 1882.[22] Plaintiff concedes that his research has thrown but little light on the question of what act the Secretary must perform to "settle" other Indians on the 1882 reservation, and believes defendant's research has been similarly unproductive.

■ We are of the opinion that neither the test as to the character of use and occupancy of "other" Indians, as suggested by defendant nor the test as to whether the Secretary acted to "settle" other Indians, as suggested by plaintiff, is alone sufficient in determining whether "other" Indians have been "settled" on the 1882 reservation. In our view, Indians other than Hopis acquired rights in the 1882 reservation under the executive order provision in question if: (1) such Indians used and occupied the reservation, in Indian fashion, as their continuing and permanent area of residence, and (2) the undertaking of such use and occupancy, or the continuance thereof, if undertaken without advance permission, was authorized by the Secretary, exercising the discretion vested in him by the executive order.

The general principle just stated provides a starting point for our discussion. It does not dispose of all the legal problems to be encountered in determining whether the Secretary in fact settled any Navajos in the 1882 reservation. Nor does it provide any guidance as to what effect Secretarial settlement of Navajos, if any were settled, had on pre-existing Hopi rights in the reservation. These are questions which can best be dealt with as they emerge during the course of the following discussion.

■ The evidence is overwhelming that Navajo Indians used and occupied parts of the 1882 reservation, in Indian fashion, as their continuing and permanent area of residence, from long prior

pany, 314 U.S. 339, 345, 62 S.Ct. 248, 86 L.Ed. 260; Mitchel v. United States, 9 Pet. 711, 34 U.S. 464, 486, 9 L.Ed. 283; Alcea Band of Tillamook v. United States, 59 F.Supp. 934, 103 Ct.Cl. 494, 558; and Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347, 368. In the Santa Fe case, the court said, 314 U.S. at page 345, 62 S.Ct. at page 251:

"Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact. If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from the lands wandered over by many tribes), then the Walapais had 'Indian title' which, unless extinguished, survived the railroad grant of 1866."

21. Plaintiff argues that the Homestead law refers to the act of the individual seeking the benefit of the law, no administrative official being called upon to "settle" anyone.

22. Plaintiff contends that while Indian title as interpreted by the court with respect to Indian reservations has been determined to be the right of occupancy and use, no case has been found which makes the converse true, that such title can be created by merely using and occupying the land. Moreover, he in effect argues, the concept of aboriginal title no more than that of settlement under the Homestead law, involves administrative action, while under the Executive Order of December 16, 1882, such action is a specific requirement.

to the creation of the reservation in 1882 to July 22, 1958, when any rights which any Indians had acquired in the reservation became vested.[23]

The Navajo population in the reservation steadily increased during all of this period. In 1882 there were only about three hundred Navajos living in the area. By 1900 this had increased to 1,826. In 1911 the Navajo population was estimated to be two thousand, and by 1920 this had grown to between twenty-five and twenty-seven hundred. The Navajo population climbed to 3,319 by 1930, and to about four thousand by 1936. About six thousand Navajos were living within the reservation in 1951. By 1958, the Navajo population probably exceeded eighty-eight hundred.

The use and occupancy of the reservation area for residential purposes by a constantly increasing number of Navajos, is therefore definitely established, and we have so found. But the critical question is whether such use and occupancy was by authority of the Secretary, granted in the exercise of the discretion lodged in him by the executive order to "settle" other Indians on the reservation.

None of the twenty-one Secretaries of the Interior who served from December 16, 1882 to July 22, 1958, or any official authorized to so act on behalf of any of these Secretaries, expressly ordered, ruled or announced, orally or in writing, personally or through any other official, that, pursuant to the discretionary power vested in him under the executive order he had "settled" any Navajos in the 1882 reservation, or had authorized any Navajos to begin, or continue, the use

and occupancy of the reservation for residential purposes.

In the absence of any order, ruling, or announcement of this kind, defendant produced evidence on the basis of which, he urged, such Secretarial act or acts of discretion should be implied. This evidence relates to such matters as the extent to which administrative officials acquiesced in the known presence of Navajos in the reservation and the reasons therefor; the extent to which Government assistance was rendered to Navajos in the reservation as compared to that rendered to Hopis and the reasons therefor; and the issuance of official pronouncements concerning the respective rights of the Hopis and Navajos in the reservation and the officially-asserted basis for rights so recognized. Plaintiff produced counter evidence of the same general character.

We turn to a discussion of that evidence.

For a period of nearly six years following issuance of the executive order, the known presence of a relatively small number of Navajos in the 1882 reservation was neither condemned nor sanctioned by administrative officials. These Navajos were not officially labeled as interlopers and no effort was made to eject them from the reservation. On the other hand, they were not publicly recognized as having any rights in the reservation and they were provided with no assistance or supervision of the kind which, on a modest scale, was being supplied to Hopis.[24]

We conclude that nothing occurred during this initial period which would warrant the finding and conclusion that

23. In Healing v. Jones, 174 F.Supp. 211, 216, we held that from the date of the enactment of the Act of July 22, 1958, 72 Stat. 402, the beneficiaries of the trust thereby created "had a vested equitable interest therein capable of judicial recognition and protection."

24. In August, 1886, S. S. Patterson, then the Navajo Indian Agent, held a general council of Indians at Keams Canyon, within the 1882 reservation. Hopis representing five villages and thirty to forty Navajos living in the vicinity of Keams Canyon, attended this meeting. The Hopi representatives' favored the establishment of a school at Keams Canyon, and promise to send sixty to seventy children from the villages. A few Navajos also said they would send their children to this school. Patterson reported this to the Washington office but the record does not indicate whether accommodation of Navajo children at this

the Secretary had, by implication, settled Navajos in the reservation pursuant to the "such other Indians" provision of the 1882 executive order.

On September 20, 1888, Inspector T. D. Marcum reported to the Office of Indian Affairs that Hopis were complaining of Navajos "on their reservation," with flocks and herds, destroying Hopi crops and ruining their grazing lands. On September 26, 1888, Herbert Welsh, Corresponding Secretary of the Indian Rights Association, wrote to William F. Vilas, Secretary of the Interior. He told the Secretary of complaints he had received from Hopis concerning injuries inflicted upon them as a result of "the continual intrusions and depredations" of the Navajos. Welsh suggested that a military force be sent to the area for the purpose of holding a council with the Navajos to inform them that the depredations must cease.

These two reports were turned over to R. V. Belt, Chief, Indian Division, for consideration. On October 10, 1888, Belt sent a memorandum to the Secretary expressing approval of the recommendation that a military expedition be sent to the area. He concluded this memorandum with these words:

"The Moquis reservation was established by Executive Order of December 16, 1882, for the Moqui and such other Indians as the Secretary of the Interior may see fit to settle thereon. It comprises no lands set apart for the Navajoes and no Navajoes have been settled thereon by the Department."

On the same day on which this memorandum was written, it was received by Secretary Vilas. Later the same day, he wrote to the Secretary of War requesting that a company of troops be dispatched to the area with instructions "to remove all Navajo Indians found trespassing

with their herds and flocks on the Moqui reservation and to notify them that their depredations must cease and that they must keep within their own reservation." In this communication Secretary Vilas also made the identical statement that Belt had made to the effect that no Navajos had been settled in the reservation.

We do not agree with defendant that the Secretary's statement should be discounted because of the expedition with which he acted after receiving the memorandum from Belt. To the extent, however, that this statement represents an expression of opinion by the Secretary as to the meaning of the 1882 order, or as to what some previous Secretary did or did not do in the way of settling Navajos in the reservation, the quoted statement is not competent evidence. Our view as to this is identical with that expressed earlier in this opinion in discussing whether the Navajos gained rights in the reservation on December 16, 1882.

But Vilas had been Secretary of the Interior since January 16, 1888. His statement therefore represents the best possible evidence that between January 16, 1888 and October 10 of that year, when the statement was made, no Navajos were settled in the reservation by Secretarial authorization. We so find and conclude.

The military expedition which Secretary Vilas requested reached the reservation in December, 1888. Due to the fact that winter was coming on, Navajo movement in the area adjacent to the Hopis was at a minimum. Forcible removal of Navajo families at that time of year would also have caused great hardship. For these reasons the officers in charge of this expedition determined not to force an immediate evacuation. Instead, they confined their action to a show of force and a warning that depredations must cease.[25]

school was approved and, if so, whether any Navajo children attended during these first years. The school at Keams Canyon was opened in 1887.

25. It was during this period that Col. E. A. Carr, commanding officer at Fort Wingate, New Mexico, wrote to Navajo Chief Sam Begody. The colonel asked Chief

Officials in the Office of Indian Affairs were advised of this development and were apparently content to let the military proceed under the new plan. Defendant believes that, in view of this acquiescence, it should be inferred that the Secretary had impliedly settled these resident Navajos in the reservation.

We do not agree. Only a short time before, the Secretary had expressly stated that he had not settled any Navajos in the reservation. There were no official pronouncements during the months which followed indicating a change of position. The decision of the military against forcible ejection of Navajos was not based on any supposed rights the Navajos had acquired in the reservation by settlement or otherwise. This considerate treatment was professedly motivated, as Indian Office officials knew, by a desire to avoid inflicting hardships on Navajo families, where not immediately necessary to protect the Hopis. If there was any other motivation it was probably the desire to avoid antagonizing the aggressive Navajo Indian Tribe at a time when the Government was seeking to maintain peace with the Indians of the West.

In the summer of 1889, there were renewed complaints of Navajo encroachments upon the Hopis, the theoretical twelve-mile limit prescribed by Col. Carr apparently being disregarded by the Navajos. From the beginning to the end of 1890 there were further complaints of this kind. The Hopis living at Oraibi, the largest Hopi village, ceased sending children to the Keams Canyon school, partly because of the Government's failure to protect the Hopis from the Navajos.

In February, 1890, Commissioner T. J. Morgan instructed Charles E. Vandever, the Navajo Agent at Gallup, New Mexico, to immediately take energetic and proper steps, without endangering the peace, to keep the Indians " * * * within the limits of their reservation, and to return roving Indians to the reservation." The only Indians excepted from this order were those who had settled upon lands outside of their reservation for the purpose of taking homesteads. No Navajos had moved into the 1882 reservation for that purpose, because that area had not been opened for homesteading.

It follows that, under Commissioner Morgan's instructions, all Navajos then in the 1882 reservation were subject to removal. They could not have been removed if they had been settled in the reservation by Secretarial authority. Hence the instructions indicate that from June 10, 1889, when Morgan became Commissioner, to February, 1890, when the instructions were issued, no Navajos had been settled in the 1882 reservation by Secretarial authority.

On December 16, 1890, special agent George W. Parker sent a telegram to the Commissioner stating that a company of soldiers should be sent at once to remove "trespassing" Navajos from among the Hopis, and to arrest rebellious Oraibi Hopis who refused to send their children to the Keams Canyon school. The Commissioner telegraphed General McCook at Los Angeles and, on December 17, 1890, a military expedition was sent on its way.[26] On December 22, 1890, the Commissioner sent instructions to Parker to cooperate with the troops and school superintendent Ralph P. Collins "in such way as may be proper to eject the Navajos from the Moqui country to protect the Moquis from the former. * * * "

The troops reached Keams Canyon on Christmas Eve, 1890, and shortly thereafter, with their use, the revolt of the Oraibi Hopis against the Keams Canyon

---

Begody to notify the Navajos in the 1882 reservation that they had no right to move nearer to the Hopi villages, and that they must move back and stay "at least twelve miles away from the Moquis. * * * "

26. On December 18, 1890, the Commissioner made a full report of developments to the Secretary of the Interior, stating that "It is very desirable that the Navajos should be forced to retire from the Moqui reservation. * * * "

school was broken. Winter being already well advanced, the Navajos were not on the move and Lt. Charles H. Grierson, in charge of the troops, reported that he saw no Navajo herds in the vicinity of the Hopi villages. Lt. Grierson apparently did not have instructions to carry out the Commissioner's plan to have Navajos ejected from the Hopi country. Instead, his instructions were to hold interviews with the Navajos and explain to them that they should cease molesting the Hopis.

Again, the Washington office apparently acquiesced in the decision of the military not to forcibly eject Navajos from the 1882 reservation. But, as in the case of the similar attitude adopted by the Commissioner's office in 1888, we do not believe that implied Secretarial settlement of Navajos is to be inferred from such acquiescence.

There were apparently two reasons why it was decided not to use force on this occasion, neither of which was predicated upon the view that the Navajos had rights in the reservation, however acquired. One of these was that, until the 1882 reservation boundary lines were distinctly marked, Navajos could not be blamed for entering that area. The other was that every effort was being made at this time to avoid antagonizing the Navajo Indian Tribe. Thus Lt. Grierson was instructed by Capt. H. K. Bailey, at Los Angeles, that he should be very "guarded" in his action, especially towards the Navajos, "and under no circumstances, if it can be avoided, will any harsh measures be taken towards them at this time."[27]

Early in 1891, Parker, Navajo Agent David Shipley, School Superintendent Collins, and Thomas V. Keam, a pioneer of the area, decided that the most feasible way of meeting the immediate problem was to prescribe a circular boundary around the Hopi villages, having a radius of sixteen miles, within which the Navajos were instructed not to enter. They proceeded to do this, marking the circular boundary by mounds and monuments.

The Commissioner was advised of this plan, being told that both the Hopis and Navajos were agreeable thereto. The Commissioner apparently acquiesced in the arrangement, although it was never expressly confirmed by the Washington office. This 1891 line is referred to in the record and briefs as the "Parker-Keam" line. In what turned out to be a colossally over-optimistic statement, the Commissioner, on January 30, 1891, reported to the Secretary that the affairs between the Hopis and Navajos in the vicinity of Keams Canyon "have been brought to a satisfactory conclusion."

The significance which defendant draws from establishment of the so-called Parker-Keam line, is predicated on the fact that it operated to assure Navajos residing outside that line but inside the 1882 reservation that they would not be disturbed. We are asked to infer therefrom that, by implication, the Secretary settled Navajos in the 1882 reservation, but outside of the Parker-Keam line.

If this circumstance were considered independently of all the other events of the period, such an inference might be warranted. But immediately prior thereto the Commissioner had ordered the removal of Navajos and had only acceded to less stringent measures out of considerations unrelated to any claim of right in the Navajos. During this same period the Government was rendering substantial assistance to Hopis in the reservation but none at all to resident Navajos unless a few Navajo children were then attending the Keams Canyon school.

Moreover, the significance to be attached to the establishment of the Parker-Keam line must be judged not alone in the setting of circumstances which

27. That the Washington office shared this reluctance to rile the Navajo Indian Tribe at this particular time is evidenced by the directions Parker received from the Commissioner on December 22, 1890, " * * * to exercise proper care and tact not to inflame the minds of the Navajos and endanger an outbreak with them. * * * "

then existed, but also in the light of subsequent events. There are many instances in the long history of this controversy in which an interpretation of a particular occurrence, perhaps justified by immediately surrounding circumstances, proves unwarranted when considered in a broader context. As we shall shortly see, administrative action in the years immediately following establishment of the Parker-Keam line negates the view that any Navajos had previously gained rights in the reservation by Secretarial settlement or otherwise.

We therefore conclude that practical considerations, unassociated with any official recognition of Navajo rights, dictated acquiescence in the attempt to solve the problem by means of the Parker-Keam line. Up to early 1891, no Secretary of the Interior had settled any Navajos in the 1882 reservation.

Early in 1892, administrative officials put into effect a plan to allot lands to individual Indians in the reservation. While, under this plan, Navajos in the reservation were not permitted to be uprooted in order to allot lands to Hopis, neither were they permitted to receive allotments themselves. No Indian was allowed an allotment unless his father or mother was a Hopi.[28] This distinction between rights accorded Hopis and Navajos is explainable only on the hypothesis that the Navajos in the reservation were not then settled Indians within the meaning of the 1882 executive order.

Several years were then to pass before there would be other events of significance. In 1899, the superintendent of schools at Keams Canyon complained of Navajo depredations and urged that the Navajos be returned to the Navajo reservation. The Washington office, however, decided that nothing should be done "as the Navajoes have always trespassed upon the Moqui resn. * * *" The following year, rejecting a proposal that traders on the reservation not be permitted to do business with Navajos, the Commissioner said that it was not practical or fair to ask traders to keep the "trespassing" Navajos out by refusing to trade with them.

It would appear that if the Navajos were then "trespassers" in the reservation, as they were authoritatively labelled, they were not settled Indians within the meaning of the 1882 order. The described Government inaction is not necessarily inconsistent with that label. Refusal to eject Navajos at this time may well have been motivated by the same considerations which led to acquiescence in the military decision against ejectment in prior years. Refusal to restrict the traders in the manner proposed was specifically attributed to the hardship this would place upon traders rather than any rights which had been acquired by the Navajos.

Again, several years elapsed before there were other occurrences relevant to the question under discussion. In Part II of the Indian Department Appropriation Act of March 1, 1907, 34 Stat. 1015, under the heading "Arizona" (34 Stat. 1021), the Secretary of the Interior was authorized "to allot lands in severalty to the Indians of the Moqui Reservation in Arizona, in such quantities as may be for their best interests * * *." It was further provided that such allotments would be subject to the provisions of the General Allotment Act of February 8, 1887, 24 Stat. 388–391.

The then acting Commissioner apparently construed the words "Indians of the Moqui Reservation," as used in the 1907 act, to include Navajos then located in the reservation who intended to remain there and who desired to receive allotments. Thus, on February 25, 1909, he instructed field officials to allot lands in the reservation to such Navajos. He further advised, however, that Navajos living in the reservation who declined to accept allotments "can be removed from the reservation." In conveying these instructions, the acting Commis-

---

28. This first allotment project was discontinued in the fall of 1894, without any allotments having been approved.

sioner made reference to the "such other Indians" provision of the Executive Order of December 16, 1882, stating that this provision provided "ample authority" for the instructions which were given.

The clear intendment of these instructions, given by the authorized representative of the Secretary, is that Navajos then living in the reservation who intended to make it their permanent homes, and who indicated a willingness to accept allotments, were thereby "settled" in the reservation pursuant to the authority vested in the Secretary under the executive order. All other Navajos living in the reservation, however, without regard to length of residence or intention to make the reservation a permanent home, were subject to removal and therefore were not "settled" at that time.

Approximately three hundred Navajos residing on the 1882 reservation indicated a willingness to accept allotments, and received allotments subject to approval. In 1911 this second allotment project was abandoned, and none of the allotments to Navajos or others was approved. These three hundred Navajos must nevertheless be regarded as "settled" Indians, since the only Navajo permanent residents who were denied that status under the acting Commissioner's ruling of February 25, 1909, were those who were unwilling to accept allotments.

It is not ascertainable from this record who these three hundred Navajos were; which, if any, were still living on July 22, 1958, and residing in the reservation; or which of them, if any, had descendants living in the reservation on the latter date and, if so, who were such descendants. It is therefore not possible, on this record, to find that any Navajos residing in the reservation on July 22, 1958, derived rights of use and occupancy by reason of the fact that, in the years 1909 to 1911, the Secretary had settled three hundred unidentified Navajos in the reservation.

There are several reasons why, as we find and conclude, the Secretarial settlement of three hundred Navajos in the reservation in connection with the 1907–1911 allotment project, did not effectuate a Secretarial settlement of the Navajo Indian Tribe in the 1882 reservation. These reasons are: (1) only three hundred of some two thousand Navajos then living in the reservation were settled in this manner; (2) the only Navajos who may be deemed to have been settled at that time were those who agreed to accept allotments, and the acting Commissioner ruled that Navajos who declined to accept allotments "can be removed from the reservation"; (3) the purpose of the allotment system being to remove lands from communal ownership and place them under individual ownership (see Federal Indian Law, Department of the Interior, page 773), the fact that the Government indicated a willingness to allot lands to Navajos (these allotments were never approved) does not tend to show a purpose to settle the Navajo Indian Tribe; and (4) events subsequent to 1911 show that the Navajos were not administratively treated as a "settled" tribe.

It was during this second allotment period that administrative personnel of the Office of Indian Affairs began to speak of Navajo "rights" in the reservation. Writing to the Commissioner on January 24, 1911, Hopi Superintendent A. L. Lawshe said: "As I understand the matter the two tribes now have substantially equal rights which should be preserved." C. F. Hauke, the Second Assistant Commissioner, making reference to this statement in a letter to an official of the Indian Rights Association, commented: "The Superintendent's report indicates that he appreciates the fact that the Navajos and Moquis have equal rights on the reservation. * * "

Neither Lawshe nor Hauke indicated what they believed to be the source of the asserted "rights" of the Navajos. There is no indication that they regarded the Navajos as having been "settled" pursuant to the executive order. But if this inference is warranted, it still is not helpful in the absence of an indication that the officials were reporting contem-

poraneous administrative action, as distinguished from expressing an opinion as to past action. Finally, there is no evidence that these views were then accepted or shared by the Secretary or the Commissioner.

We conclude that these statements of Lawshe and Hauke are without significance on the question of whether Navajos were "settled" in the reservation. Nor were there, with the exception of the allotment instructions referred to above, and action thereunder, any other events during this second allotment period, from 1907 to 1911, from which it may reasonably be inferred that Navajos were "settled."

During the seven-year period from 1911 to the enactment of May 25, 1918,[29] the view first emerged in official circles that, by virtue of the "such other Indians" provision of the Executive Order of December 16, 1882, Navajos then living on the reservation, and their descendants, had acquired rights of use and occupancy. This opinion was first expressed by Leo Crane, then superintendent at Keams Canyon, in his annual report for 1912. It was repeated by him in 1914, 1915 and 1918, and the same view was expressed by Inspector H. S. Traylor in a report dated June 6, 1916.

These expressions of opinion would have significance only if they manifested contemporaneous action by the Secretary, or his authorized representative, settling Navajos in the reservation pursuant to the authority reserved in the executive order. But neither Crane nor Traylor were shown to have authority to act for the Secretary in such matters. It is therefore not necessary for us to determine whether they were purporting to do so, or whether they were merely expressing their personal opinions as to the legal effect of the executive order, or as to past Secretarial acts of settlement.

It was also during this seven-year period, that suggestions for an actual and permanent division of the reservation between Hopis and Navajos, with marked boundary lines, were first advanced. Superintendent Lawshe had, in fact, made such a suggestion on February 14, 1911, just before abandonment of the second allotment project. A similar suggestion was made on November 20, 1911, by Leo Crane. On February 10, 1912, Second Assistant Commissioner Hauke advised Crane that the general problem was under consideration. In his 1912 report, and again in 1915, Crane reviewed this suggestion. A somewhat similar suggestion was made by Inspector Traylor on June 6, 1916.

As a result of suggestions made by then Congressman Hayden at a Congressional committee hearing held in December, 1917, Crane was instructed to investigate the desirability of dividing the 1882 reservation. He reported on March 12, 1918, agreeing with Traylor that the reservation should be divided, the Navajo part, however, to be only for the use of Navajos who resided in the reservation in 1882 and their descendants.

Had the suggestions of Lawshe, Crane and Traylor for a division of the reservation been accepted by the Secretary or Commissioner, the inference would be permissible that the Navajos were recognized by them as having rights of use and occupancy in the reservation. But there is no indication that these recommendations received acceptance above the level of field personnel.

A third development during this period which requires comment has to do with suggestions that Navajos be removed from the reservation. On May 26, 1914, H. F. Robinson, Superintendent of the Land Division of the Department of the Interior, wrote to the Commissioner recommending that the Navajos be moved from the 1882 reservation to available lands to the south. Crane, who was asked to submit his views concerning this proposal, recommended against it.

29. The Act of May 25, 1918, 40 Stat. 570, 25 U.S.C. § 211, prohibited the creation of any Indian reservation or the making of any additions to existing reservations in the States of New Mexico and Arizona, except by Act of Congress.

In his report of June 6, 1916, Inspector Traylor spoke of the territory occupied by Navajos as "rightfully" belonging to the Hopis, and suggested that some Navajos might be persuaded to move to the west and south of the 1882 reservation. He would then set aside the area within the reservation, vacated by the Navajos, for the Hopis for a period of ten years, with the provision that if they did not use and occupy it, the Navajos again be permitted to take it over.

There is nothing in the record to indicate that either Robinson's or Traylor's suggestion for removing Navajos received acceptance in Washington. The fact, however, that Robinson's recommendation resulted in a request for a report from Crane, is some indication that the Commissioner's office did not then regard the proposal as legally precluded. If the Secretary or Commissioner had then held a very firm conviction that Navajos were present on the reservation as of right, it is doubtful if they would have called upon a field official to report on the proposal to remove the Navajos.

During this seven-year period from 1911 to 1918, the Navajos on the reservation received very little assistance from the Government, while the Hopis, as in the past, received substantial aid. On June 22, 1914, Crane stated, in a report to the Commissioner, that for thirty years the Government "has lavished its help upon the Hopi and has done practically nothing for the Navajo on this reserve. * * *" In a report dated March 12, 1918, he stated that thirty years of agency effort had been devoted almost entirely to the Hopis, the Navajos only being given implements. He added: "The Government since 1868 has neither sought to educate or rule them [Navajos] * * *."

The events of the seven years from 1911 to 1918, reviewed above, provide no factual basis for the inference that, during that period, the Secretary "settled" Navajos on the 1882 reservation. In fact there is no indication that, during this period, the Secretary or Commissioner recognized Navajos as having any rights in the reservation, whether as "settled" Indians or otherwise. That the Navajos were actually regarded by them as without any such rights is indicated not only by the fact that a proposal to remove Navajos was seriously considered, but by the difference in treatment accorded Hopis and Navajos on the reservation with respect to the rendering of Government assistance.

During the nine-year period which followed, ending with the enactment of March 3, 1927,[30] there were further official expressions of opinion concerning the status of Navajos in the 1882 reservation.

At a Congressional Committee hearing held in May, 1920, Hopi Superintendent E. L. Daniel erroneously quoted the "such other Indians" provision of the executive order,[31] and stated that this "usual jigger * * * lets the Navajos in. * * *" Daniel also made the incorrect statement to the committee that, in 1882, "there were practically as many Navajoes on the reservation as Hopis."

On July 26, 1924, Marschalk, Chief of the Land Division, answering an inquiry from the Commissioner as to the status of the Navajos on the reservation, replied:

"It does not appear that the Navajos have at any time been especially authorized by this Department to occupy and use any part of the Moqui Reservation, but they have simply been allowed to remain by sufference, although as before stated, the order of 1882 would seem to include them, or at least those who were there at that time."

---

30. On that date 44 Stat. 1347, 25 U.S.C. § 398d was enacted. Under this statute, changes in the boundaries of reservations created by executive order, proclamation, or otherwise for the use and occupation of Indians were prohibited, except by Act of Congress, with an exception not here applicable.

31. Daniel quoted the provision as reading: "such other Indians that might belong on the reservation."

As we said with regard to the somewhat similar expressions of Crane and Traylor, these statements by Daniel and Marschalk would have significance only if they manifested contemporaneous action by the Secretary or his authorized representative, settling Navajos in the reservation. But, as in the case of Crane and Traylor, neither Daniel nor Marschalk were shown to have authority to act for the Secretary in such matters. These latter statements, as in the case of the former, therefore do not aid us in resolving the question under discussion.

On September 29, 1924, an official as high as the Commissioner of Indian Affairs for the first time expressed an official view to the effect that Navajos had rights of use and occupancy in the reservation. This was, in fact, the first of thirteen instances during the twenty-year period from 1924 to 1944, when a Commissioner made an official statement or ruling which expressly, or by necessary implication, recognized Navajos as having rights in the 1882 reservation.

Without doubt the Commissioner of Indian Affairs had authority to exercise the discretion vested in the Secretary of the Interior to "settle" other Indians in that reservation.[32] It therefore becomes necessary to determine whether these statements by the Commissioner, to the effect that Navajos had rights in the reservation, and the administrative action or inaction with which they were associated, considered separately or together as a developing course of conduct, warrant the conclusion that the Secretary had, in the implied exercise of his discretion, and pursuant to his reserved authority under the 1882 executive order, settled Navajos in the reservation.

The statement of September 29, 1924, was made in answer to a protest which Hopi leaders had made against the plan to convert the Keams Canyon facilities into a school for Navajo children residing in the reservation. Referring to the "such other Indians" provision of the executive order, Commissioner Charles H. Burke said: "It is believed this language was intended to permit Navajo Indians who had lived on the reserve for many years to continue there."

For the reasons previously indicated, this statement is not competent evidence of the meaning of the 1882 executive order, or that a previous Secretary of the Interior had settled Navajos in the reservation. But since the "such other Indians" provision is not self-executing, and since the statement was made in justification of the Commissioner's concurrent act in providing schooling for resident Navajo children at Keams Canyon, the statement and act, considered together may have been intended to manifest implied settlement of Navajos at that time.

It is true that the Commissioner's statement insofar as it undertook to explain the intention of those who issued the executive order, is erroneous. As already stated in this opinion, the "such other Indians" provision was inserted in the order without any particular intent with regard to Navajos. Nor in framing that order was there any intent to limit the Secretary's authority to settle "other Indians," to Navajos who "had," by 1882, "lived on the reservation for many years. * * *," as Burke erroneously stated.

But if Commissioner Burke did thereby exercise the discretionary power to settle other Indians, the fact that he did so in favor of Navajos in the mistaken belief that this was the designed purpose of the "such other Indians" provision, is immaterial. We are not concerned with the motivation for the exercise of such discretion, or whether the result was good or bad.

In one respect, however, there appears to be an inconsistency between what the

32. See 25 U.S.C. § 2, Rainbow v. Young, 8 Cir., 161 F. 835, 837. In one of these thirteen statements (the one dated February 7, 1931), the Secretary of the Interior joined. In another, dated October 27, 1941, the Assistant Secretary of the Interior joined.

Commissioner said and what he did. By his statement he seems to have indicated, in effect, that he was settling in the reservation Navajos who had lived therein for many years prior to 1882. But he was apparently, at the same time, making the school facilities at Keams Canyon available to all resident Navajo children without regard to the number of years their families had lived in the reservation. This is but the first of several instances to be related in which the Commissioner, while verbally seeming to indicate a limited exercise of the discretionary power in favor of Navajos, sanctioned administrative action consistent with a much broader exercise of such power.

It is not necessary to reach a conclusion based on this 1924 incident as to how this seeming inconsistency is to be resolved. Nor is it, for that matter, necessary to reach a firm conclusion based on this one incident, that any Navajos were settled in the reservation pursuant to the "such other Indians" provision of the executive order.

It is sufficient at this point in the opinion to observe that the 1924 statement and the surrounding circumstances have some tendency to indicate that some Navajos were then settled in the reservation pursuant to an implied exercise of authority under the executive order. It must be left to subsequent events, as hereinafter discussed, to reveal whether this initial tendency of the evidence is to be confirmed or undermined, and to accurately appraise the extent to which, if any, the discretionary power was exercised.

On March 31, 1926, Senator Ralph H. Cameron wrote to the Commissioner requesting comment concerning a proposal which had come to him from four Hopi chiefs that the President or Congress act to make the 1882 reservation "an entire Hopi reserve," and requiring Navajos residing therein to move "to their own reservation." Replying under date of April 13, 1926, Commissioner Burke referred to the "such other Indians" provision of the executive order,[33] and stated:

"* * * There were undoubtedly some Navajo Indians, living on this land before the reservation was set apart; others have gone there since and settled. Their rights must be carefully considered."

In apparently recognizing resident Navajos as having rights in the reservation the Commissioner thus relied upon the "such other Indians" provision of the executive order. But the inference which might be drawn therefrom that he was thereby reporting contemporaneous administrative action pursuant to that provision is somewhat undermined by the use he made of the word "settled." The executive order contemplates settlement of other Indians only where the Secretary or his representative, in the exercise of discretion, consents thereto. Here, however, the Commissioner uses the term "settled" as if it required only action by the Navajos in taking up residence in the reservation.

The Commissioner's resistance to the proposal that the 1882 reservation be made an exclusive Hopi reservation, manifested in this letter, was borne out by contemporary administrative inaction. Neither the Secretary nor the Commissioner sought Presidential or Congressional authority to make this an exclusive reservation, nor did they take any steps to remove Navajos therefrom. Yet, when appraised in terms of comparative Government assistance rendered to resident Hopis and Navajos, the area was not then administered as if Navajos had equal rights with the Hopis.

During the years from 1918 to 1927, the Navajos in the reservation received slightly more Government assistance than formerly. But it was still insubstantial as compared to the aid received by the Hopis. Some sheep-dipping vats were installed for the joint use of the Hopis and Navajos. But in 1921, 563 out

33. The Commissioner incorrectly quoted this provision, stating that it read: "and such other Indians as the Secretary of the Interior may designate."

of 648 Hopi children were being served at five Government schools in the reservation, and at non-reservation schools, while only fifty of the six hundred resident Navajo children were being given schooling—all of them off the reservation. In 1926, however, the dilapidated facilities of a former period at Keams Canyon were reconstructed and put to use as a boarding school for Navajo children.

By the Act of March 3, 1927, 44 Stat. 1347, 25 U.S.C. § 398d, changes in the boundaries of reservations created by executive order for the use and occupation of Indians were prohibited, except by Act of Congress.

On November 19, 1927, Hopi Superintendent Edgar K. Miller wrote to the Commissioner suggesting that the 1882 reservation be divided between the Hopis and the Navajos. The Commissioner directed Miller to submit a more detailed report concerning this proposal. This further report was filed on January 16, 1928, Miller again recommending that the reservation be divided.

On April 13 of that year, Assistant Commissioner Merritt requested Chester E. Faris, District Superintendent at the Southern Pueblo Agency, Albuquerque, New Mexico, to make a careful investigation and full report concerning the proposal for a division of the reservation. Faris submitted this report on May 12, 1928, recommending against any division of the reservation. The proposal then rested in abeyance until March 14, 1930, when Commissioner Rhoads wrote to Faris, and on April 16 to H. J. Hagerman, special Indian commissioner, requesting them to recommend what action should be taken to resolve the Hopi-Navajo controversy.

While these studies were in progress, Hopi Superintendent Miller wrote to the Commissioner transmitting a petition signed by a number of Hopis, setting out their land claims. Replying to Miller under date of July 17, 1930, the Commissioner quoted the "such other Indians" provision of the 1882 order, and stated:

" * * * it has always been considered that the Navajos have the right to use part of the reservation."

This reference to the "such other Indians" provision, as support for the view that Navajos have rights of use and occupancy in the reservation, again has some tendency to indicate a contemporaneous exercise of the discretionary power thereby conferred. While there is reference in this statement to what the past view was, it purports also to represent the view of the then Commissioner. Such tendency as this Commissioner's statement has to establish a contemporary settling of Navajos is not diminished by the described setting in which it was made. A division of the reservation between Hopis and Navajos was under active consideration. Concurrently with this statement the Hopi proposal for ejectment of the Navajos was expressly rejected.

On November 20, 1930, Hagerman and Faris submitted the report which had been requested of them in March and April of that year. They recommended that a part of the reservation consisting of about 438,000 acres and including the Hopi villages and adjacent lands, be set aside and fenced for the exclusive use of the Hopis. It was their proposal that after these fences were built, the Hopis and Navajos should be told that the Hopis must keep inside the fence, and the Navajos outside, as far as grazing or agriculture or other occupancy was concerned. The Hopis, however, would have the right to drive their cattle "through the Navajo area" to the railroad.[34]

34. In this connection it was further stated, in the Hagerman report:

" * * * At the same time they [Hopis] should be enjoined that they must respect the fenced area and if they do not they will be punished to the full extent of the law. It should be made clear to them that these areas are set aside merely for the use of the Hopis, and that in no way does it mean that the Government's passing upon the areas so set aside as lands to which the Hopis

Hagerman and Faris submitted a general description, stated in miles, directions, and natural monuments, for the area which they proposed be set aside for the Hopis within the 1882 reservation. They suggested, however, that if the proposal was accepted in principle, a detailed reconnaissance of the lines as approximately proposed be made with a view of a thorough examination of the terrain so as to find the best location for the fence.[35]

In this report Hagerman and Faris did not indicate why they thought the Navajos residing in the 1882 reservation had such standing that a large part of the area should be set aside for their use.

On February 7, 1931, Commissioner C. J. Rhoads and Secretary of the Interior Ray Lyman Wilbur, joined in a letter to Hagerman, accepting the recommendation that the 1882 reservation be divided. "We are of the opinion," they stated, "that there should be set aside and fenced for the exclusive use of the Hopis a reasonable and fair area of land." These two officials stated that it had for years been the hope of the department that the Hopi and Navajo Indians would become so friendly and cooperative as to enable them to live in the same country without any jurisdictional or other differences. It was now their reluctant conclusion, however, that real amalgamation was virtually impossible, and that it was therefore desirable to designate separate districts for the use of each group.

The Commissioner and Secretary indicated that they were "disposed to accept" the boundary designations proposed by Hagerman and Faris. But they also directed that field studies be undertaken with a view of being able to designate the lines specifically "when the time comes."

Unlike the statements of previous Commissioners to the effect that resident Navajos had rights of use and occupancy in the 1882 reservation, no statement of this kind was made in the Commissioner's and Secretary's letter of February 7, 1931. That they did recognize resident Navajos as then having such rights is implicit, however, in their acceptance of the proposal to fence the reservation, thus setting aside a large share of the area for the exclusive use of the Navajos.

It remains to be determined whether such recognition of Navajo rights of use and occupancy necessarily establishes that the Secretary then and there, impliedly exercising the discretionary power vested in him under the 1882 executive order, "settled" resident Navajos in the reservation.

It is possible that the Commissioner and Secretary, giving heed to some previous official expressions of opinion, may have erroneously thought that the 1882 executive order, of its own force and effect, operated to confer rights of use and occupancy upon Navajos living in the reservation area in 1882 and their descendants. Or they may have thought that some previous Secretary had settled resident Navajos in the reservation.

But in their letter of February 7, 1931, the Commissioner and Secretary did not limit their implicit recognition of Navajo rights, to Navajos who were residing in the area in 1882, and their descendants, or to Navajos settled by a previous Secretary, and their descendants. They recognized all Navajos then living in the area, whether or not recent immigrants thereto, as having such rights.

In our view, this 1931 blanket and all-inclusive recognition of Navajo rights of use and occupancy is explainable on no

have any specific proprietary right. Nor should it be definitely indicated that there may not in the future be alterations or changes in the districts set aside for the use of the respective tribes."

35. It was stated in this report that a few Navajos resided within the area proposed to be reserved for Hopis, and that a few

Hopis resided outside of those lines. A few other Hopis, while residing within the reserved area, occasionally grazed cattle outside that area. Hagerman and Faris also stated that a good deal of the area adjacent to the proposed fence lines "is actually not even now much used by either the Hopis or Navahos."

other basis than that the Secretary, impliedly exercising the authority reserved to him in the executive order, was then and there settling in the 1882 reservation all Navajos then residing in that reservation.

On September 24, 1932, Commissioner Rhoads, replying to an inquiry from the Hopi Tribal Council, stated in effect that the 1882 reservation was created for the joint use of Hopis and Navajos.[36]

In a memorandum dated December 20, 1932, addressed to the Secretary, Commissioner Rhoads stated that when the Executive Order of December 16, 1882 was issued, there were, in addition to the Hopis, "a considerable number of the Navajo Indians * * * living within the area withdrawn." "Hence," Rhoads stated, "the language used in the Executive Order was designed to take care of the rights of both groups of Indians in their joint use and occupancy of the lands." Rhoads further advised the Secretary that the 1882 reservation "is considered to be withdrawn for the joint use of both groups of Indians and not for the exclusive use of the Hopi or Navajos. * * *"

These statements of September 24 and December 20, 1932, were the first instances in which it was officially asserted that the 1882 order had the effect of es-

tablishing a joint reservation. For the reasons stated earlier in this opinion, this view was incorrect and, in any event, the Commissioner's opinion as to the meaning of the 1882 order is not competent evidence.

These statements by the Commissioner have no tendency to show that he was then, as the authorized representative of the Secretary, settling Navajos in the reservation. But neither did they operate to undermine the Secretarial act of settlement evidenced by the letter of February 7, 1931.

Administrative action between February 7, 1931 and December 20, 1932, indicates that the department wanted to extend the Navajo rights, so recognized, to Navajos moving into the area after February 7, 1931. Such action further indicates, however, that the department hoped to accomplish this by Congressional enactment, thus avoiding the necessity of exercising Secretarial discretion in settling future Navajo immigrants to the 1882 reservation. The reference here is to the course followed by the department in drafting the Navajo Indian Reservation Act, as reviewed in the margin.[37]

By the end of 1932, the department gave up the attempt to solve the problem legislatively. It submitted to Congress

36. The Commissioner stated on this occasion, that the "such other Indians" provision of the 1882 order was used " * * * to take care of a large number of Navajo Indians who were then living within the Executive Order area, as reports on which the Executive Order withdrawal was based indicate that the purpose of the withdrawal was for the joint benefit of the Hopi and Navajo Indians living within the area."

37. In a second report, dated January 1, 1932, Hagerman furnished a more detailed description of the part of the 1882 reservation which it was proposed be set apart for exclusive Hopi use. On February 8, 1932, the department submitted to Congress a proposed bill defining the exterior boundaries of the Navajo Indian Reservation. The area so described included the 1882 reservation, but there was added a proviso to the ef-

fect that so much of the area included within the over-all boundaries as fell within a tract then particularly described " * * * be, and the same is hereby set aside as the Hopi Indian Reservation and should be held for the exclusive use and occupancy of the Hopi Tribe." The area so set aside would be the same as that which Hagerman had described in his 1932 report.

This proviso was later changed to eliminate the description of lands set aside exclusively for Hopis, and to provide that " * * * the Secretary of the Interior is hereby authorized to determine and set apart from time to time for the exclusive use and benefit of the Hopi Indians, such areas within the Navajo boundary line above defined, as may in his judgment be needed for the use of said Indians."

Under either form of the proviso, it was thus contemplated that all Navajos

a new draft of the bill which was to become the Navajo Indian Reservation Act of June 14, 1934, 48 Stat. 960. In this draft all reference to the setting aside of a part of the 1882 reservation for the Hopis was deleted and it was specifically provided that the legislation would not affect the existing status of the 1882 reservation. On March 11, 1933, Commissioner Rhoads advised the Hopis that the new draft fully protected the rights of the Hopi Indians in the executive order area "and also those Navajo Indians who are already living therein."[38]

In our view the events and pronouncements of the period between February 7, 1931 and March 11, 1933, as reviewed above, warrant the inference, which we draw, that all Navajos who entered the 1882 reservation during that period were, by implication, settled therein by Secretarial action. Therefore, as matters stood on March 11, 1933, all Navajos then residing in the reservation had rights of use and occupancy in the reservation, such rights arising from implied Secretarial settlement.

On June 18, 1934, Congress enacted the Indian Reorganization Act, 48 Stat. 984. Under § 6 of that act, the Secretary of the Interior was directed to make rules and regulations for the administration of Indian reservations with respect to forestry, livestock, soil erosion and other matters. Pursuant to the authority thus conferred, the Commissioner, with the approval of the Secretary, on November 6, 1935, issued regulations affecting the carrying capacity and management of the Navajo range.

By their terms, these new regulations purported to be limited to the "Navajo Reservation," which, under the Navajo Reservation Act of June 14, 1934, expressly excluded the 1882 reservation. These regulations provided a method of establishing land management districts with the assistance of the Navajo Tribal Council. They also provided a means of establishing, with the advice and consent of the Navajo Tribal Council, methods of range management "in order to protect the interests of the Navajo people."

Early in 1936, boundaries for these land management districts were defined. But notwithstanding the fact that the regulations providing for such districts were expressly limited to the Navajo reservation, and the Navajo Tribal Council was the only Indian group given a say in their determination, these districts embraced not only the Navajo reservation, but also all of the 1882 reservation.[39] Several such districts (Nos. 1, 2, 3, 4, 5 and 7) included parts of the Navajo reservation and part of the 1882 reservation.

District 6, which laid entirely within the 1882 reservation, was specifically designed to encompass the area occupied exclusively by Hopis. The record before us contains no metes and bounds description of district 6, as created in 1936. It is depicted in the map which is a part of this opinion and was probably roughly equivalent to the area of exclusive Hopi occupancy as proposed and described in the second Hagerman report, referred to in footnote 37.

The full implications of this 1936 administrative action were to be revealed by later events. But it was already apparent that the 1882 reservation was thenceforth to be administered as if the

entering the area in the future, as well as those who were settled therein as of February 7, 1931, would be entitled to take up occupancy in that part of the 1882 reservation outside of the proposed area of exclusive Hopi occupancy.

38. Commissioner Rhoads added: " * * * it would appear that such of the Navajos as are permanently residing on the reservation would probably be entitled to share with the Hopis in any income from future mineral production."

39. In section 4 of Article VII, of the Constitution of the Hopi Indian Tribe, which became effective on December 14, 1936, when approved by the Secretary of the Interior, it is provided that "The administration of this article [relating to land] shall be subject to the provisions of section 6 of the Act of June 18, 1934." This Hopi consent came several months after the plan was put into operation in early 1936.

Navajos had rights of use and occupancy in at least a large part of it.[40] Whatever opinion may be warranted concerning the way this was accomplished,[41] or as to its desirability, the administrative action itself, which was apparently acceptable to the Washington office, compels the inference that, by implied Secretarial action, all Navajos then residing in the 1882 reservation were settled therein.

From this time to October, 1941, all administrative action and pronouncements pertaining to the 1882 reservation tended to confirm the view just stated. It also indicates that as additional Navajos entered the area for permanent residence between 1936 and 1941, they were, by implication, settled therein by the Secretary pursuant to his reserved authority under the 1882 executive order.

Under the supervision of Allen G. Harper, a comprehensive plan for the administration of the Navajo and 1882 reservations was developed in early 1937. Under this plan, the Navajo Service was given supervision over all of the 1882 reservation except land management district 6, hereinafter referred to as district 6. Even as to that district, the land planning division of the Navajo Service was given supervision over construction and engineering projects and land planning. It was specifically provided that all administrative matters which affected the Hopi and Navajo Indians jointly were to be under the jurisdiction of the Hopi superintendent as to district 6, and under the jurisdiction of the Navajo superintendent as to the other land management districts. The Harper plan was put into effect on July 1, 1937.[42]

From then until October, 1941, there was a wide variety of administrative actions and pronouncements confirming this administrative policy of recognizing Navajos as settled Indians.[43] Perhaps the most significant of these was the effort to make final adjustments in the boundaries of district 6 so that the district would contain all lands used or

---

40. These land management districts are referred to in a letter dated May 15, 1936, from Navajo General Superintendent E. R. Fryer to Commissioner John Collier. In this letter Fryer stated that Hopi Superintendent Hutton was in agreement with him that "the entire Hopi and Navaho Reservation" should be considered "as one super land management district."

41. Failure to forthrightly declare that Navajos were being settled in the reservation; extension of Navajo range regulations to the 1882 reservation without statutory authority; and the failure to consult Hopis in formulating the land management district plan.

42. This was accomplished by the promulgation, on June 2, 1937, effective as of July 1, 1937, of comprehensive grazing regulations for the Navajo and "Hopi" reservations. Again, the regulations were approved by the Navajo Tribal Council, but the approval of the Hopis was not obtained and apparently not sought. The regulations provided, however, that

"* * * only such part of these regulations shall be enforced on the Hopi Reservation as are not in conflict with provisions of the constitution, by-laws, and charter of the Hopi Tribe heretofore or hereafter ratified or any tribal action authorized thereunder: * * *"

43. Among individual incidents of this kind are the following: On January 28, 1938, Navajo Superintendent Fryer, who appeared to have the approval of the Washington office in such matters, wrote to Hopi Superintendent Hutton stating that no Hopis were to move outside of district 6 who had not previously lived outside, and that no new Navajo families would move into district 6. Thereafter a Hopi could not move outside of district 6 without obtaining a permit. In a conference with the Hopi Tribal Council at Oraibi, Arizona, on July 13, 1938, Commissioner John Collier stated that this permit system had nothing to do with the reservation boundary, but was a part of the grazing regulations.

When Hopis found it necessary to travel to other parts of the 1882 reservation to obtain wood, they were required to obtain permits from the Navajo Service, just as were the Navajos residing in that reservation.

In a conference with Hopi leaders on April 24, 1939, Commissioner Collier stated that the 1882 reservation was set aside for the Hopis "and other Indians resident there. * * *"

needed by the Hopis, and then to set aside that area as an exclusive Hopi reservation, leaving the remainder of the 1882 reservation for the exclusive use of the Navajos.

This effort got under way on July 13, 1938. On that date Commissioner Collier, meeting with Hopi leaders at Oraibi, Arizona, suggested that the Hopi and Navajo Tribal Councils select committees to negotiate with each other upon boundary matters. The Hopi leaders did not agree to this suggestion, whereupon Collier intimated that an effort to divide the reservation would nevertheless be made. Studies were actually already in progress to determine the number of Navajos residing within district 6 as it then existed, and the number living within a proposed extension of that district. The study, which was being made by Gordon B. Page and Conrad Quoshena of the Department's Soil Conservation Service, also dealt with the number and location of Hopis residing outside that district.

A meeting of field officials to consider the district 6 boundary matter was held at Window Rock, Arizona on October 31, 1938. It was there agreed that an intensive survey should be made of the area then occupied by Navajos and Hopis, and that every effort be made to delineate the actual individual use of lands by the respective tribes. Page and Quoshena were designated to make this survey with the assistance of range riders. Page submitted his report in December, 1940.[44]

In November, 1939, C. E. Rachford, Associate Forester, U. S. Forest Service, Department of the Interior, was designated to head a commission to conduct a further field investigation. The commission was instructed to make recommendations concerning the boundaries of district 6, and the boundaries of an exclusive Hopi reservation. The Rachford studies got under way on December 4, 1939. On December 14, 1939, a field conference was held at Winslow, Arizona, at which the procedures to be followed in considering these boundary matters were agreed upon.

Rachford made his boundary report on March 1, 1940. He stated that over four thousand Navajos and nearly three thousand Hopis were then living in the 1882 reservation. Rachford expressed the view that due to the hostility and aggressiveness of the Navajos, the Hopis had been restricted to an area entirely too small for a reasonable expansion needed to meet the ever-increasing population.

Rachford recommended that the Hopis continue to use such agricultural areas then occupied by them outside district 6, stating that "even this is inadequate." He proposed that the boundary line of district 6, extended to include these agricultural lands, be marked and fenced. Under this plan, Navajos would be excluded from the enlarged district 6, and Hopis would be forbidden to go outside that district, except for ceremonial purposes,[45] and to gather wood and coal.[46]

The land management district boundary changes recommended by Rachford

44. He reported that 2,618 Hopis and 160 Navajos were living within the boundaries of district 6 as it then existed.

45. Throughout the entire 1882 reservation, and beyond, the Hopis had numerous ceremonial shrines, some of which they had maintained and visited for hundreds of years. These Hopi shrines were of two kinds, the Kachina shrines and the eagle shrines. The Kachina shrines were the same for all Hopi mesas and clans, but the eagle shrines belonged to one or the other of the clans of the different pueblos. Eagle shrines were associated with the collection of young eagles from the eagle nests in the cliffs, at least one eagle always being left in the nest. The

hunting of eagles was accompanied by rituals involving the use of corn pollen and prayer sticks, conducted at a particular site before the young eagles were seized. The young eagles were then taken back to the villages, raised to a certain size when they were killed, and the feathers used for ceremonial purposes.

The Navajos as well as the Hopis had sacred places both within and without the 1882 reservation. These were, for the most part, eagle-catching shrines, but the Navajos probably had less need than the Hopis for the use of eagle feathers in their ceremonials.

46. Since the earliest times, Hopis had found it necessary to travel to distant

in this report would result in adding 21,479 acres to district 6, increasing the total acreage for that district from 499,248 to 520,727. While the Navajo and Hopi superintendents asked for clarification of some of Rachford's recommendations, they were, in the main, acceptable to administrative field officials. A draft of order was then prepared which would effectuate the Rachford recommendations.

On October 9, 1940, the Commissioner submitted this draft to the Secretary of the Interior for approval. In this draft it was recited that, subject to stated exceptions, the Hopi Indians "shall have the right of exclusive use and occupancy" of that part of the 1882 reservation therein described in metes and bounds. This description conformed to the Rachford boundary proposal as modified by agreement between the Hopi and Navajo superintendents.

This draft of order further provided that the part of the 1882 reservation situated outside of the above-described boundary "shall be for the exclusive use and occupancy of the Navajo Indians," subject to certain provisos.[47] In a letter to the Secretary which accompanied this draft, the Commissioner described the order as one to govern "the use rights of the Hopis and the Navajos within this area." It was explained that the exercise of coal, wood and timber rights under rules and regulations of the conservation unit serving the two jurisdictions would be continued. The Commissioner also stated that the Hopis were not to be disturbed in their use of certain areas within the Navajo jurisdiction for ceremonial purposes, and that, to enable this to be done, permits would be issued to Hopis by the Navajo superintendent.

The draft of this order was submitted to the department's solicitor, Nathan R.

places in the 1882 reservation in order to obtain firewood and building timber. On December 16, 1922, the Hopi and Navajo agencies had entered into a cooperative agreement governing the cutting and gathering of wood and timber. On December 20, 1932, Commissioner Rhoads had recommended that a "proportionate" area within the 1882 reservation be designated for the exclusive use of the Hopis, and that a "fire wood reserve" be set aside for them.

In August, 1933, Commissioner Collier had rejected a request that the Hopis be permitted to cut timber within the San Francisco Mountain area outside of the 1882 reservation. He stated that yellow pine as well as pinon and juniper was available in the Black Mountain country, within the 1882 reservation, "which is much more accessible and will meet their needs." In the report of Range Examiner Joseph E. Howell, Jr., dated April 16, 1934, it was stated that, for the Hopis, "Some provision must be made for fuel wood, house timbers, and other miscellaneous wood products."

In Navajo Superintendent Fryer's memorandum of August 25, 1937, he had stated: "Hopi Indians can go outside district 6 for wood. We shall, however, attempt to set aside an area somewhere adjoining district 6 for the exclusive use of the Hopi Indians." At the Oraibi meeting held on July 14, 1938, Commissioner Collier had suggested that his

proposed boundary negotiating committee " * * * prepare the description of * * * any timber and wood privileges that are 'needed for the Hopis, with a view of negotiating for any needed protection or privilege. * * *"

No exclusive wood-cutting area for the use of Hopis was ever set aside. Instead, they were placed under the same permit system as were the Navajos when it was necessary to seek wood in that part of the 1882 district embraced within district 4. Despite this permit system, agency officials continued to assure the Hopis that they had timber "rights" in the 1882 reservation extending beyond district 6. In a conference held in Washington, D.C., on April 24, 1939, Commissioner Collier told a committee of Hopi leaders that his office would "protect your timber right * * * to give access to the forests. * * *"

47. The first of these was to the effect that Navajos who established farming or grazing "rights" within the Hopi part prior to January 1, 1926, "shall have the right to remain occupants of the land they now use. * * *" The second proviso was to the effect that Hopis who established farming or grazing "rights" outside of, but adjacent to, the Hopi part prior to January 1, 1926, " * * * shall have the right to continue occupany and use of said lands, such rights to be determined by the Commissioner of Indian Affairs."

Margold, who returned it to the Commissioner, disapproved, on February 12, 1941. The draft was disapproved because it would operate to exclude Hopis from the major part of the 1882 reservation without their assent. This would be illegal, the solicitor ruled, for the following reasons: (1) It was contrary to the prohibition against the creation of Indian reservations without statutory authority, contained in the Acts of May 25, 1918 (40 Stat. 570, 25 U.S.C. § 211), and March 3, 1927 (44 Stat. 1347, 25 U.S.C. § 398d); (2) it was in violation of the rights of the Hopi Indians within the 1882 reservation; and (3) it was not in conformity with the provisions of the Hopi constitution approved December 19, 1936.[48]

It will be observed that the solicitor's disapproval was not predicated on the view that the Navajos were without rights in the 1882 reservation. Rather it was based on the more limited premise that such rights as the Navajos had therein were not exclusive and could not be made exclusive without the assent of the Hopis.[49]

The Office of Indian Affairs thereafter redrafted the proposed order in an attempt to meet the objections of the solicitor. The revised draft, however, was also disapproved.[50] Further efforts were then made to draft an order pertaining to district 6 which would meet the solicitor's objections.

At the same time the proposed revision of boundary lines was further reviewed. This led to the preparation of a revised description which would result in a district 6 acreage of 528,823, as compared to

48. The Indian Reorganization Act, enacted on June 18, 1934, 48 Stat. 984 (amended in respects not here material by the Act of June 15, 1935, 49 Stat. 378), provided in § 16 thereof a means whereby unorganized Indian tribes could establish a government for themselves. Prior to 1936, the Hopi Indians had never had an integrated tribal organization. In that year Hopi leaders determined to effectuate such an organization, utilizing the procedures set out in § 16 of the Indian Reorganization Act.

After several months of work, and with the assistance of a field representative of the Office of Indian Affairs, a constitution and by-laws were formulated. On October 24, 1936, the constitution and by-laws were adopted by a vote of 651 to 104 out of a total eligible Hopi vote of 1,671. The Secretary of the Interior approved these instruments on December 19, 1936, and they became effective on that day.

In holding that the proposed order dividing the 1882 reservation between Hopis and Navajos was not in conformity with the provisions of the Hopi constitution, the solicitor stated:

"At least three provisions of the Hopi constitution bar action by the Department to limit the use and occupancy of the Hopi Indians to the proposed Hopi Unit without the assent of the Hopis. Article I defining the jurisdiction of the Hopi Tribe, provides that the authority of the tribe shall cover the Hopi villages 'and such land as shall be determined by

the Hopi Tribal Council in agreement with the United States Government and the Navajo Tribe.' This provision was intended to provide, and clearly does provide, for the defining of a boundary to the land of the Hopis by agreement of all parties concerned. Article VI, section 1(c) embodies the provision in section 16 of the Indian Reorganization Act that organized tribes may prevent the disposition of their property without their consent, Article VII places in the Hopi Tribal Council supervision of farming and grazing upon the lands beyond the traditional clan and village holdings."

49. This is further demonstrated by the fact that the solicitor suggested in his opinion that if the Hopis would assent to grazing regulations which did not purport to cut down their reservation, there would be no objection " * * * to the Navajo superintendent issuing grazing permits to Navajos within the remainder of the 1882 reservation under the authority of the Secretary to settle non-Hopis within the reserve."

50. In a letter dated April 5, 1941, Assistant Solicitor Charlotte T. Lloyd explained that the revised draft contained no provision for the consent of the Hopis to their exclusion from areas outside of district 6, and there was no provision for compensation for the disruption of the farming activity of the Navajos and Hopis who would be uprooted.

the then existing acreage of 499,248, and Rachford's proposal of 520,727.

On September 4, 1941, the Office of Indian Affairs ruled that in view of the solicitor's opinion and the provisions of Article I of the Hopi Constitution, the proposed changes in the boundaries of district 6, as revised, should be submitted to the Hopi Tribal Council for consideration. This was done and the Hopi Tribal Council, while considering the matter, wrote to the Commissioner under date of September 23, 1941, propounding ten questions of fact and law.

It was stated earlier in this opinion, after reviewing events to early 1936, that all administrative action and pronouncements from then until October, 1941, tended to indicate continued Secretarial settlement of Navajos as they entered the 1882 reservation for purposes of permanent residence. We think this is amply demonstrated by the preceding review of events between those two dates.

But, on October 27, 1941, in answering the questions propounded by the Hopi Tribal Council, Commissioner Collier made a statement which runs at cross purposes with the inference otherwise arising from the indicated administrative action of this 1936–1941 period.[51] In his reply the Commissioner stated, in effect, that the Hopis residing in the reservation had the right to the non-exclusive use and occupancy of the entire reservation except to the extent that they might voluntarily relinquish such rights. As for Navajo rights, the Commissioner wrote:

"It is our opinion that only the individual Navajos residing on the 1882 Reservation on October 24, 1936, the date of the ratification of the Constitution of the Hopi Tribe by the Hopi Indians, and the descendants of such Navajos, have rights in the Reservation. Since, however, such Navajo Indians do not have a separate organization but are governed by the general Navajo

tribal organization, Article I of the Hopi Constitution referring to the 'Navajo Tribe' means the general Navajo tribal organization."

The quoted statement has two significations—one with respect to Navajo rights recognized, and the other with regard to Navajo rights denied. Concerning the first of these facets, the Commissioner recognized that all Navajos who entered the 1882 reservation up to October 24, 1936, had rights therein. He could not have thought that these rights arose because the reservation was for the joint use of Hopis and Navajos, else those entering after October 24, 1936 would also have rights therein. It must therefore have been his view that Navajo rights acquired before October 24, 1936 were based on Secretarial settlement.

Commissioner Collier's opinion as to previous settlement of Navajos would not be competent evidence of that fact, except for the period during which he had served as Commissioner. He entered that office on April 21, 1933. Thus, the quoted statement fully confirms the inference we have drawn from other evidence, that all Navajos who entered between early 1933 and late 1936, obtained rights of use and occupancy by virtue of Secretarial settlement.

The other facet of the Commissioner's statement of October 27, 1941, amounts to a disavowal of any Secretarial settlement between October 24, 1936 and October 27, 1941, when the statement was made. This disavowal appears to be at variance with administrative action during the latter period. All Navajos living within the part of the 1882 reservation outside of district 6 were dealt with alike, regardless of time of entry, and would have been similarly protected by the proposed boundary orders which the department sought to effectuate. While the order was not promulgated this was not due to any view expressed, prior to October 27, 1941, that any Navajos then

51. The Commissioner's letter of this date was approved on January 8, 1942 by Assistant Secretary of the Interior Oscar L. Chapman.

residing in the reservation were without rights, but on the view that their rights, tacitly recognized, were non-exclusive.

We find it unnecessary, however, to resolve this apparent conflict between what the Commissioner said at the end of the 1936–1941 period, and what he did during that period.[52] We may in fact assume that, because of this statement, Navajos entering during that period may not be regarded as settled by Secretarial action during those years. Subsequent events establish to our satisfaction that, if that be true, they along with all other Navajos who entered for purposes of residence prior to July 22, 1958, were nevertheless thereafter settled by the later implied action of the Secretary.[53]

We now proceed to review the circumstances and events which lead us to this conclusion.

After October 27, 1941, as before, the practice continued of denying grazing permits to Hopis for use of lands outside of district 6 except where they were able to show that they had historically and continuously grazed their sheep at least a portion of the year outside that district. The necessary effect of this restriction was to save non-district 6 grazing lands within the 1882 reservation for exclusive Navajo use.[54] Such Navajo use was not limited to Navajos who had moved into the reservation prior to October 24, 1936.

On March 28, 1942, the Hopi Tribal Council passed a resolution disapproving the Rachford recommendations, as modified, for changes in the district 6 boundaries. On April 18 of that year Commissioner Collier instructed Willard R. Centerwall, associate regional forester at Phoenix, Arizona, to conduct a new study of the Hopi-Navajo boundary problem. Centerwall submitted his report on July 29, 1942. It carried the approval of Burton A. Ladd, then Superintendent of the Hopi "Reservation,"[55] and Byron P. Adams, Chairman of the Hopi Tribal Council.

Centerwall recommended a metes and bounds description for district 6 which would accomplish a substantial enlargement of that district. The acreage of district 6, applying his proposed description, would have been 641,797, as compared to the original 499,248, and Rach-

52. It is to be noted that the Commissioner's statement of October 27, 1941, was actually made in response to questions engendered by Hopi consideration of the proposed 1941 order which would have implicitly recognized that all Navajos living in the reservation in 1941 had rights of use and occupancy therein.

53. In a report dated April 9, 1954, addressed to Orme Lewis, Assistant Secretary of the Interior, Commissioner Glenn L. Emmons expressed the opinion that it would be extremely difficult and expensive to determine the Navajos and their descendants who were in residence in the 1882 reservation on October 24, 1936.

54. Since approval of the Hopi Tribal Council had not been obtained, continuance of this practice was contrary to the legal advice provided by the solicitor in his opinion of February 12, 1941. While the solicitor had suggested that such a regulation might be promulgated, he also stated: "However, since the suggested regulation' would not only regulate the use of the range but would exclude Hopis from the use, for grazing purposes, of the land outside the Hopi Unit, the regulations must have the assent of the tribe."

The significance of this ruling by the Commissioner is more far reaching than at first might be supposed, as indicated by the following inquiry directed to the Commissioner. On September 23, 1941, the Hopi Tribal Council asked the Commissioner: "If the proposed changes in the present District require the approval of the Hopi Tribal Council, why didn't the original District require the approval of the Council?" No direct answer was made to that question.

55. In the grazing regulations which were approved June 2, 1937, effective as of July 1, 1937, the term "Hopi Reservation" was defined as follows:

"For the purpose of these regulations District 6, as now established by the Navajo Service shall constitute the Hopi Reservation until such time as the boundaries thereof are definitely determined in accordance with Article I of the Constitution and By-Laws of the Hopi Tribe."

165

ford's recommended 528,823.[56] The most important considerations which seem to have governed Centerwall in suggesting these revisions were the recognition of exclusive or predominant prior use and the full utilization of lightly loaded or idle grazing lands.[57]

Walter V. Woehlke, Assistant to the Commissioner, and J. M. Stewart, General Superintendent of the Navajo Service, raised objections to the Centerwall recommendations.[58] On September 23, 1942, however, the Hopi and Navajo superintendents joined in a letter to the Commissioner expressing the view that they could agree on adjustments in Centerwall's proposed boundaries for district 6. The Commissioner authorized them to proceed with that effort. The Hopi and Navajo superintendents then called a conference of field officials which was held at Winslow, Arizona on October 22, 1942.

Those attending the Winslow conference unanimously agreed to recommend Centerwall's proposed district 6 boundaries, with three modifications. The net effect of these modifications would be to reduce the district 6 acreage, as proposed by Centerwall, by 10,603 acres, leaving a district which would still be 131,946 acres larger than originally established. These boundary recommendations were submitted to the Commissioner on November 20, 1942. In doing so, the Hopi and Navajo superintendents suggested that policies be put into practice which would, in effect, divide the 1882 reservation between Hopis and Navajos, limiting the Hopis to the district 6 area and reserving the remainder for the exclusive use of the Navajos.[59]

---

56. The Centerwall report contained a detailed "justification" for the boundary revisions recommended by him. In the four Navajo land management districts of the 1882 reservation (Nos. 3, 4, 7 and 5) which would lose land to district 6 under this proposal, approximately fifty-one Navajo families would have been adversely affected.

57. Among other factors which Centerwall took into consideration were the following: (1) simplifying fencing by getting away from sharp breaks and escarpments; (2) establishing boundaries which are easy to follow and observe; (3) making room for overlapping in grazing use; (4) avoiding the necessity of "splitting" waters; (5) definitely setting out work areas for each Service; (6) simplifying livestock management and movement; (7) eliminating friction between Hopi and Navajo livestock operators; and (8) eliminating "split" administration.

58. Woehlke, who had bitterly assailed the solicitor's opinion of February 12, 1941, also complained of Centerwall's reliance thereon, saying that Centerwall quoted from that opinion "with a noisy licking of the chops. * * *" Referring to the solicitor's opinion in his memorandum commenting upon the Centerwall report, Woehlke said: "That memorandum was a fine example of the workings of the legalistic mind at its worst."

59. This recommendation, however, contemplated certain exceptions from the overall effect just stated. Navajos and Hopis who had established residence on either side of the district boundary would be permitted to continue living there. Grazing "rights" would be established on the basis of past use. Rights to wood and timber on the whole reservation would be equal. Hopis would be assured the right to ingress or egress to areas "within Navajo jurisdiction" for ceremonial purposes.

This latter suggestion concerning access to Hopi shrines was consistent with similar recommendations which had been made over a long period of time. It appears to have been advanced first in December, 1931, in a letter from Assistant Commissioner J. Henry Scattergood to Senator Lynn J. Frazier. Like suggestions were made by Commissioner Rhoads in May and December, 1932; Navajo Superintendent Fryer in December, 1936; Commissioner Collier in July, 1938, April, 1939, and October, 1940; Walter V. Woehlke in December, 1939, and Rachford, in his report of March 1, 1940.

A specific provision to this effect was incorporated in the proposed Secretarial order prepared in 1937, but never signed. Article IV of the Hopi By-laws adopted together with the Hopi Constitution in 1936, and still in effect, provides:

"The Tribal Council shall negotiate with the United States Government agencies concerned, and with other tribes and other persons concerned, in order to secure protection of the right of the Hopi Tribe to hunt for eagles in its traditional territories and to secure adequate protection for its outlying established shrines."

On April 24, 1943, the Office of Indian Affairs approved the boundaries, carrying capacity,[60] and statements of administrative policy, as recommended by the two superintendents on November 20, 1942. While the Hopi Tribal Council had approved the Centerwall recommendations it was apparently not asked to act on the boundary modifications proposed by the Hopi and Navajo superintendents on November 20, 1942. Nor was it asked to concur in their policy recommendations under which Hopis would, for the most part, be excluded from all of the 1882 reservation except district 6. In nevertheless approving these recommendations on April 24, 1943, and thereafter putting them in effect, the Office of Indian Affairs thus once again acted counter to the legal advice given by the solicitor on February 12, 1941.[61]

A considerable adjustment in place of residence and range use was thereafter made by both Hopis and Navajos in order to accommodate themselves to the new district 6 boundaries and the associated administrative policy of exclusive occupancy. Many Navajo families, probably more than one hundred, then living within the extended part of district 6, were required to move outside the new boundaries and severe personal hardships were undoubtedly experienced by some.

The events which transpired between October 27, 1941 and April 24, 1943, as reviewed above, warrant the inference, which we draw, that all Navajos who entered the 1882 reservation between October 24, 1936 and April 24, 1943, were settled thereon by implied Secretarial action. Thus, accepting at face value, the Commissioner's statement of October 27, 1941, to the effect that no Navajos entering the reservation after October 24, 1936 had gained rights in the reservation, those Navajos nevertheless gained rights of use and occupancy by subsequent implied Secretarial action.[62]

In 1944, Commissioner Collier made two statements to the effect that there had never been any formal Secretarial action settling Navajos in the 1882 reservation. In the first of these, made to Hopi leaders at Oraibi, Arizona on September 12, 1944, the Commissioner plainly intimated that there had been implied action of this kind during his term of office.[63]

In the second, made in a letter dated December 16, 1944, addressed to Dr. Arthur E. Morgan, the Commissioner stated that there had never been any official Secretarial act settling Navajos in the reservation,

"* * * but in the absence of any action to eject the Navajo In-

---

60. "Carrying capacity" refers to the ability of the land to support livestock. Carrying capacity was expressed in "sheep units," that is, the number of sheep which could be supported on the land for one year. It required five "sheep units" to support one horse or mule, four "sheep units" to support one head of cattle, and one "sheep unit" to support one goat.

61. See note 54 above.

62. The statement of October 27, 1941, purporting to exclude Navajos entering after October 24, 1936, from rights in the 1882 reservation, seems to be predicated on the notion that the Hopi Constitution, ratified on October 24, 1936, precluded Secretarial settlement of Navajos entering the reservation after that date. However, we find nothing in the Hopi Constitution which has the effect of cutting off the authority of the Secretary, provided for in the 1882 executive order,

to settle "other Indians" in the reservation. Hence the October 24, 1936 statement, while here assumed to represent a disavowal of Secretarial settlement between October 24, 1936 and October 27, 1941, points to nothing which would bar subsequent Secretarial acts settling Navajos.

63. The Commissioner said, on this occasion:

"* * * Now, we don't need to debate as to the number of Navajos there were in the Executive Order in 1882. I'll explain, whether any Navajos were there or not, they came. The Secretary made a report every year how many there were and he let them come in each year. In addition he went to Congress and asked for money for schools for both the Navajos and the Hopis on the Executive order, and they gave it to him. * * *"

dians who had filtered into the area it was in time assumed that these Navajo were there with the consent of the Secretary."

In the quoted statement the Commissioner seems to be expressing his view as to the assumptions made by some previous official, and as to the legal status of Navajos in the reservation prior to his term of office, which began on April 21, 1933. So regarded, the statement is not, for reasons already stated, competent evidence on the question of settlement or non-settlement.

But the statement of Commissioner Collier of December 16, 1944 was also intended to reflect the assumption which he himself made in dealing with resident Navajos who moved into the reservation after he became Commissioner. Limited to those Navajos, the Commissioner's assumption that they were there with the consent of the Secretary, considered in the light of the concurrent administrative action reviewed above, establishes, in our opinion, that those Navajos were settled by the implied action of the Secretary under whom Commissioner Collier served.[64]

It is immaterial whether any such view with respect to Navajos moving into the reservation during his administration was prompted by a misconception as to assumptions made by previous officials, or as to the legal status of Navajos already residing in the reservation. Any such misconceptions would have relevance only as to the motivation

of the Commissioner in settling newly-arrived Navajos, a matter which is not subject to judicial review.

In any event, nothing that Collier could say with respect to his own reasons for according Navajos equal status with Hopis in the reservation could restrict the authority of any subsequent Secretary or his authorized representative in settling Navajos. Events subsequent to the expiration of Collier's term of office on March 14, 1945, presently to be reviewed, amply demonstrate that all Navajos who entered the reservation prior to July 23, 1958, for purposes of residence, were settled therein by the implied action of the Secretary.

In February, 1945, fences were constructed by the Government along the revised district 6 line. The practice of excluding Hopi stockmen from areas outside of district 6 was continued, and with the aid of the fences, was more effectively enforced.

On June 11, 1946, Felix S. Cohen, then acting solicitor of the Department of the Interior, rendered an opinion with regard to the ownership of the mineral estate in the 1882 reservation. 59 Decisions of Dept. of Interior, 248. Stating that the department, on January 8, 1942, took the position that Navajos "would not be allowed to settle on the reservation after October 24, 1936,"[65] Cohen ruled that Navajos who had entered the reservation prior to that date were to be deemed settled therein pursuant to the 1882 executive order.[66]

64. Harold L. Ickes was the Secretary of the Interior during all of the time that Collier served as Commissioner.

65. The "Department" position to which Cohen made reference, was the Commissioner's statement of October 27, 1941, which was approved by the Secretary on January 8, 1942. See note 51 above. The Commissioner's statement, quoted earlier in this opinion, was not that Navajos "would not be allowed to settle on the reservation after October 24, 1936," but that only the Navajos residing on the reservation on October 24, 1936, "have rights on the Reservation."

66. In this regard, Cohen stated in his opinion:

"* * * I do not mean to imply that the Navajos could acquire rights in the reservation through the Secretary's inaction or through his failure to exercise the discretion vested in him by the Executive order. But the Secretary is not chargeable with neglect in this matter. Throughout the years the Secretary has sought and obtained funds from Congress which have been used for the education of the children of Hopis and Navajos alike, and the grazing and the livestock of both groups has been permitted and regulated by the Secretary. This, to my

Cohen predicated his October 24, 1936 cut-off date on Navajo settlement, on the October 27, 1941 statement of the Commissioner, and the Secretary's approval thereof on January 8, 1942. But we have indicated above that subsequent events demonstrate that no such cut-off date was in fact imposed. Navajos entering after October 24, 1936 for purposes of residence, were treated exactly the same as those who had entered prior thereto. All were dealt with as if they had rights of use and occupancy, and the only possible source of those rights was implied Secretarial settlement. Indeed, the very 1941–1942 statement relied upon as expressing the department's "cut-off" position, was made in justification of the action of the Government in recognizing the legal status of all Navajos then (1941–1942) in the reservation. This belies, at the outset, any official intention to put the asserted "cut-off" policy into effect.

Insofar as Cohen, in the quoted statement, expressed an opinion as to the legal significance to be attached to the course of official conduct through the years, the statement is not competent evidence on the question of Navajo settlement. But to the extent that the statement reports what administrative action was taken while he was acting solicitor, the statement is authoritative and substantial evidence of those facts.[67] The facts so reported were that the Secretary had sought and obtained funds from Congress which were used for the education of the children of Hopis and Navajos alike, and that the grazing of the livestock of both groups had been permitted and regulated by the Secretary.

In the late 1940's there was a considerable increase in the amount of joint administrative activity in the 1882 and the Navajo reservations. On May 4, 1948, for example, an agreement of cooperation was drawn up between the Navajo and Hopi agencies for the initiation of soil and water conservation practices. Under this plan the Navajo and 1882 reservations, considered as a unit, were divided into five work areas. District 6 and several other districts which included 1882 reservation lands, were combined to constitute "work area" No. 4, with headquarters at Keams Canyon. All soil conservation activities were to be under the general supervision of the conservationist in charge, at Window Rock, Arizona.

Another example of such intermingling of Navajo and Hopi administrative action is to be found in Secretary of the Interior J. A. Krug's proposal, advanced in his report entitled "The Navajo," issued in March, 1948. It was his proposal that Navajo and Hopi families be resettled on irrigated land of the Colorado River Indian Reservation in Western Arizona. By the spring of 1949, this program was under way.

A third example of such joint agency action is evidenced by a letter dated December 14, 1949, sent by road engineer H. E. Johnson, employed by the Navajo Service at Window Rock, to Walter O. Olson, assistant Superintendent of the Hopi Agency. Johnson recommended that the Hopi road department use the Navajo road department in an advisory capacity along the pattern of the old regional office. "All construction, maintenance, and engineering should be inspected and approved by this office," Johnson wrote.

By July, 1951, the total population of the Navajo Indian Tribe was 69,167, about six thousand of whom lived within the 1882 reservation. By the summer of 1958, the Navajo population in the 1882 reservation was probably about 8,800, not including a few Navajos living within district 6, as expanded in 1943. The

---

mind, is conclusive evidence that the settlement of the Navajos on the reservation has been sanctioned and confirmed by the Secretary, and that their settlement is therefore lawful, resulting in the necessity of recognition of their rights within the area."

**67.** Cohen served as acting solicitor for periods of varying length, beginning on June 4, 1942.

places of residence of the Navajos within the 1882 reservation were scattered quite generally over the entire area outside of district 6.

According to a comprehensive Navajo school census taken in 1955, there were 2,929 Navajo children then living in the 1882 reservation. By 1958 Government schools for Navajo children were being maintained within the 1882 reservation at Pinyon, Smoke Signal, White Cone, Sand Springs, Dinnebito Dam and Red Lake.

In 1951, the Hopi population within the 1882 reservation was about 3,200. By the summer of 1958, the Hopi population was probably something in excess of that figure. Most of these Hopis resided within district 6, as expanded in 1943.[68] A few had homes, farms or grazing lands in adjoining districts in the 1882 reservation.

Other Hopi activities then being carried on outside district 6, as expanded, included wood cutting and gathering, obtaining coal, gathering plants and plant products for medicinal, ceremonial, handicrafts and other purposes, visiting of ceremonial shrines, and a limited amount of hunting.

We believe that it is indicated by the events and circumstances reviewed above that, during the last half of the 1940's, and up to enactment of the Act of July 22, 1958, all Navajos who entered the 1882 reservation for purposes of residence, were treated no differently than those who had entered between 1936 and 1945, or those who had entered before October 24, 1936. All were dealt with administratively as Indians having rights of use and occupancy in that reservation, such rights being equally protected and the welfare of all such Indians being equally served by continuous and consistent Government action through the years.

No attempt was made to separately identify the Navajos who entered prior to October 24, 1936, and their descend-

ants, much less were they accorded any privileges or assistance which was withheld from subsequent Navajo immigrants into the reservation.

In our opinion, the course of administrative action and accompanying pronouncements, from February 7, 1931 to July 22, 1958, with exceptions which we discount for reasons stated, warrant the finding, which we make, that all Navajos residing in the 1882 reservation in July, 1958 were impliedly settled therein by the Secretary of the Interior in the exercise of his authority to settle other Indians in that reservation.

The question remains whether, in settling Navajos in the reservation, the Navajo Indian Tribe itself was impliedly settled in the 1882 reservation.

Throughout the period from February 7, 1931, when Navajo rights of use and occupancy were first administratively recognized, to July 22, 1958, Navajos entered the 1882 reservation for purposes of residence without limitation as to number. Nor was any effort made to pick and choose between Navajos who might enter, all who came being administratively welcome. This course of administrative conduct is explainable only on the hypothesis that the Navajo Indian Tribe itself had been settled in the 1882 reservation.

There are other considerations which lead to the same conclusion.

Beginning at least by 1937, the Navajo Indian Tribe was administratively recognized as having duties and responsibilities as the representative of Navajos living in the 1882 reservation. The authority for the grazing regulations approved June 2, 1937, under which establishment of land management districts was authorized, rested in part on a resolution of the Navajo Tribal Council dated November 24, 1935.

Navajo residents everywhere in the reservation have always participated in the election of Navajo delegates to the

---

68. Not included in this figure are the several hundred Hopis living a few miles west of the 1882 reservation at Moencopi. The forebears of these Hopis had left "Old Oraibi" in the reservation area, and moved to Moencopi in a 1906 "revolt."

Navajo Tribal Council. Prior to 1953, these elections were supervised and conducted by the Bureau of Indian Affairs. Navajo tribal rangers were given authority to issue permits for the cutting and gathering of wood.

On January 1, 1955, the Commissioner approved resolutions of the Navajo Tribal Council, adopted in 1954, relating to traders' leases, under which the Navajo Indian Tribe granted leases to traders in the 1882 reservation.

Plaintiff, however, argues that settlement of the Navajo Indian Tribe after May 25, 1918, was precluded by the enactment of that date. That statute, 25 U.S. C. § 211, provides that no Indian reservation shall be created, nor shall any additions be made to one heretofore created, within the limits of the States of New Mexico and Arizona, except by Act of Congress. Plaintiff calls attention to the fact that defendant, for the Navajo Indian Tribe, has disclaimed any joint interest in the reservation with the Hopis. Plaintiff argues from this that the necessary effect of the exclusive Navajo tribal settlement which defendant asserts would be to add lands to Navajo Indian Reservation in Arizona, a result expressly prohibited by the 1918 Act.

■ At this point in the opinion we are considering only the question of Navajo settlement, and are not concerned with the character of any such settlement, as exclusive or joint. At a later point we will discuss the significance of the 1918 Act with regard to the character of any Navajo settlement which may be found to have occurred. In our view, the 1918 Act did not operate to terminate the authority of the Secretary, premised on the Executive Order of December 16, 1882, to settle other Indians, including Indian tribes, in the reservation area.

■ We conclude that the Navajo Indian Tribe has been settled in the 1882 reservation. See Cherokee Nation v. Hitchcock, 187 U.S. 294, 307, 23 S.Ct. 115, 47 L.Ed. 183; The Cherokee Trust Funds, 117 U.S. 288, 308, 6 S.Ct. 718, 29 L.Ed. 880.

### Specific Rights Held by Hopis and Navajos on July 22, 1958

Earlier in this opinion, following footnote reference 11, it was stated that immediately upon the issuance of the Executive Order of December 16, 1882, the Hopis gained non-vested rights of use and occupancy in the entire 1882 reservation. These rights were then exclusive in the sense that unless and until the Secretary thereafter settled other Indians in the reservation, the Hopis were the only Indians entitled to use and occupy that area. These rights were non-exclusive in the sense that the Hopis would be required to share the 1882 reservation with any other Indians the Secretary thereafter saw fit to settle in the reservation. Such rights as the Hopis had in the reservation on July 22, 1958, became vested on that date.

We have also found and concluded that, beginning on February 7, 1931, the Secretary saw fit to settle in the reservation, as they arrived (with indicated lapses), Navajos who entered the 1882 reservation prior to July 22, 1958 for the purpose of establishing permanent residence. We have further held that by at least June 2, 1937, but not prior to February 7, 1931, the Navajo Indian Tribe itself was impliedly settled in the 1882 reservation. Rights of use and occupancy thereby acquired were not vested prior to July 22, 1958, but became vested on that date.

It is now necessary to determine what specific rights of use and occupancy the Navajo Indian Tribe and individual Navajos held in July 22, 1958, by reason of such Secretarial settlement, and what specific rights of use and occupancy the Hopi Indian Tribe and individual Hopis held on that date in view of the settlement of Navajos and other circumstances.

In making this determination we must first decide whether the Navajo Indian Tribe and individual Navajos were authorized to settle in the entire 1882 reservation and, if not, what part was made available to them by such authorization.

It has previously been stated that some three hundred Navajos not identified on this record, were settled in the 1882 reservation in 1909–1911, during the second allotment period involving that reservation. It has also been indicated that there is some evidence, although perhaps not sufficient to warrant a finding, that Navajos residing in the reservation on February 29, 1924, were impliedly settled therein, in view of Commissioner Burke's statement of that date and the circumstances under which it was made. But substantial and, to us, adequate proof of implied settlement of Navajos, other than the three hundred settled in 1909–1911, came first on February 7, 1931. It was on that date that Secretary Wilbur and Commissioner Rhoads joined in a letter approving the Hagerman-Faris proposal that the reservation be divided between Hopis and Navajos.

It is therefore established that implied Secretarial settlement of Navajos and the policy of segregating Navajos from Hopis were initiated at the same time. In fact, it was the initiation of that policy which, under the indicated circumstances, warrants the inference that the Secretary settled Navajos in the reservation on February 7, 1931.

This segregation policy remained constant from the time it was initiated until the time Indian rights in the reservation became vested on July 22, 1958. This is evidenced by the efforts which were made through the years to effectuate that policy.

It was first sought to accomplish this by means of a provision to be incorporated in the proposed Navajo Indian Reservation Act. That plan failed of realization when, because of Hopi opposition, the Department of the Interior withdrew its proposal to incorporate such a provision in the bill.

The Office of Indian Affairs then sought to accomplish the same result by means of land-use regulations under which land management districts were created, one of which (No. 6) was designed to include most of the Hopis in the 1882 reservation.

When this plan was first put into operation in 1936, there was no intimation that Hopis were to be limited to the district 6 area. Nor was such a policy publicly proclaimed when comprehensive grazing regulations were approved on June 2, 1937, under which the administration of the land management districts was provided for in great detail. But shortly after the latter regulations became effective, the practice was initiated of forbidding Hopis to move outside district 6, or even to graze outside that district, without first securing permits. These permits were usually issued only on a showing of past Hopi use.

It was then sought to formalize this segregation practice by means of a Secretarial order. This attempt was abandoned when the solicitor ruled, on February 12, 1941, that such an order would be invalid unless consented to by the Hopis. But then the Office of Indian Affairs continued to accomplish the same result through its previous land-use regulations and associated practices, as modified from time to time, none of which was ever approved by the Hopis. It was on this basis that the segregation practice was continued without interruption until all rights became vested on July 22, 1958.

Secretarial settlement of the Navajo Indian Tribe and individual Navajos, between 1931 and 1958, has been implied from the general course of administrative action and policy during that period. Thus, to the extent that administrative policy in effect during that period would not warrant such an implication, Secretarial settlement of Navajos did not occur. It follows that, since it was the continuing policy to segregate Navajos from Hopis during all of these years, the implied settlement of Navajos in the 1882 reservation was at all times subject to the restriction that they were not to use and occupy that part of the reservation in which the Hopi population was concentrated.

It therefore becomes necessary to delineate, consistent with the finding and conclusion just stated, the specific geo-

graphical area in which the Navajos were authorized to settle.

This geographical area was not fixed with precision when the first general manifestation of implied settlement of Navajos occurred in 1931.[69] On November 20, 1930, when Hagerman and Faris submitted a report recommending a division of the 1882 reservation, they provided a general description of the area which, in their view, should be set aside for the use of Hopis. This description, however, was not sufficiently precise for practical application, as they themselves recognized. It was their suggestion that if their recommendation was accepted in principle, a detailed reconnaissance of the lines as approximately proposed be made with a view of developing a detailed boundary description.

It follows that, in approving the Hagerman-Faris recommendation, on February 7, 1931, the Secretary and Commissioner did not fix a precise geographical area of authorized Navajo settlement. They did direct that field studies be undertaken for the purpose of formulating a specific boundary description.

These studies were made, and the boundary lines thus arrived at for the proposed exclusive Hopi area were set out in Hagerman's second report, dated January 1, 1932. In this report Hagerman expressed the view that the proposed boundaries for this area of exclusive Hopi occupancy were fair and just to both Hopis and Navajos. He added, however, that "(t)his does not mean that they might not be changed in the future if conditions warrant."

The boundaries as proposed by Hagerman in his 1932 report were incorporated in the first draft of the Navajo Indian Reservation Act, tendered to Congress by the Department of the Interior on February 8, 1932. But, as stated earlier in this opinion, that feature of the bill was later withdrawn. Subsequent events establish that the exact boundaries of the proposed area of exclusive Hopi occupancy were still only tentative.

While the Navajo Indian Reservation bill was pending before Congress in early 1934, further studies were being carried on in the field concerning the exact boundaries of an exclusive Hopi area. A report thereon was submitted by range examiner Joseph E. Howell, Jr., on April 16, 1934. He proposed that the area for the Hopis be extended by adding 59,225 acres thereto stating, however, that this would still not include all Hopi fields.

In early 1936, the district land management plan was developed for the purpose of implementing the land-use regulations which had been issued on November 6, 1935. In order to simplify land-use administration it was determined to place in one district (No. 6) the part of the 1882 reservation in which most of the Hopis were concentrated. The record before us contains no metes and bounds description of the 1936 lines, but they are depicted on maps which are in evidence as plaintiff's exhibit 306 and defendant's exhibits 444 I and 537(f). The 1936 lines as so depicted are shown on the map which is a part of this opinion.

The 1936 lines of district 6, however, were only tentative. We say this not only because Howell's proposed modifications of those boundaries were then under consideration by the Office of Indian Affairs, but also in the light of immediately succeeding events.

In the summer of 1937, the Hopis began to complain that Navajos were encroaching upon long-held Hopi grazing and agricultural lands outside district 6. At an August, 1937 conference held to consider these complaints Navajo Superintendent Fryer made it clear that the 1936 district 6 boundaries did not include all established areas of Hopi occupancy. He stated that while it was attempted to include all Hopi range use within dis-

---

69. A part of the 1882 reservation excluded from Navajo settlement is not in dispute. Defendant has, in effect, conceded that no Navajos have ever been settled in a south-central area consisting of about 488,000 acres, as described in paragraph 12 of the findings of fact and depicted in the map which is a part of this opinion. See pretrial order No. 2, page 2.

trict 6, this proved impossible in several instances and there were still Hopis living, grazing and farming outside that district.

It was in 1937 that the effort got under way to obtain a Secretarial order which would, among other things, formalize the practice then being followed of forbidding Hopis from grazing or moving outside of district 6. In connection with this project, new studies were undertaken with respect to the boundary lines of that district. These studies eventually led to the Rachford boundary report of March 1, 1940, referred to earlier in this opinion, in which it was recommended that 21,479 acres be added to district 6.

The Rachford boundary proposals, as somewhat modified, were incorporated in the draft of the Secretarial order which was later disapproved by the solicitor on February 12, 1941. For some time thereafter the Office of Indian Affairs sought to formulate a revised form of order which would be acceptable. In this connection the boundaries of district 6 were further reviewed. This led to the preparation of a revised description which would have increased district 6 acreage by 8,096 over the Rachford proposal. Finally, all efforts to secure an order formalizing the segregation practice were abandoned. But the segregation practice itself was continued.

On April 18, 1942, Commissioner Collier instructed Centerwall to study the boundary problem. Centerwall submitted his report on July 29, 1942, recommending enlargement of district 6 to 641,797 acres, as compared to the original acreage of 499,248. The boundaries suggested by Centerwall to accomplish this enlargement were thereafter somewhat reduced by agreement between the Hopi and Navajo superintendents, resulting in a proposed district 6 acreage of 631,194.

On April 24, 1943, the Office of Indian Affairs approved the district 6 boundary lines proposed by Centerwall, as so modified.[70] It was therefore on that date that the lines within the 1882 reservation, utilized under administrative policy to segregate Hopis from Navajos, were first definitely fixed.

Accordingly, in our view, it is those lines which must be regarded as defining the part of the 1882 reservation in which Navajos were authorized to settle. Specifically, the Navajo Indian Tribe and all individual Navajos residing in the area on July 22, 1958, were authorized to settle in all parts of the reservation outside of district 6 as defined on April 24, 1943, and neither the Navajo Indian Tribe nor individual Navajos were authorized to settle within that district as so defined.

Since no Navajos were authorized to settle within district 6, as thus defined, we find and conclude that, on July 22, 1958, the Hopi Indian Tribe, for the common use and benefit of the Hopi Indians, had the exclusive interest in such area, subject to the trust title of the United States. Therefore, pursuant to section 2 of the Act of July 22, 1958, this area is henceforth a reservation for the Hopi Indian Tribe. A declaration to this effect is included in the judgment entered herein.

This leaves for determination the relative rights of the Hopis and Navajos in that part of the 1882 reservation lying outside of district 6 as defined on April 24, 1943.

By our holding that the Navajo Indian Tribe, and all individual Navajos residing in the reservation on July 22, 1958 were settled therein by Secretarial action, we have rejected the Hopi contention that Hopis have the exclusive interest in that part of the reservation now under discussion.

It is the further contention of the Hopis, however, that if the court finds and concludes that the Navajos have acquired by Secretarial settlement, rights and interests in any part of the reserva-

---

70. The metes and bounds description of district 6, as so defined, is set out in paragraph 41 of the findings of fact and is depicted in the map which is a part of this opinion.

tion, such rights and interests are not exclusive as to any part of the reservation area, but are co-extensive with those of the Hopi Indians, subject to the trust title of the United States.

The Navajos, on the other hand, contend that as to the reservation area in which it is found and concluded that Navajos have been settled,[71] the Navajo Indian Tribe, for and on behalf of all Navajo Indians, has the exclusive right and interest therein, subject to the trust title of the United States.

The Navajos advance a number of arguments in support of the contention that the Navajo Indian Tribe, on July 22, 1958, had the exclusive interest in that part of the 1882 reservation in which it has been found to have been settled. One of these is that, on July 22, 1958, the Navajos had actual exclusive use and occupancy of this area and, as used in the act of that date, "exclusive interest" means exclusive use and occupancy.

On July 22, 1958, a few Hopis were residing in that part of the reservation now under discussion. In addition, Hopis have continuously made some use of a large part of that area for the purpose of cutting and gathering wood, obtaining coal, gathering plants and plant products, visiting ceremonial shrines, and hunting.

For present purposes, however, we will assume that actual Navajo use and occupancy of the area was exclusive or was so nearly so as to render Hopi use and occupancy de minimis.

Defendant's equating of "exclusive interest" with actual exclusive use and occupancy finds no support in the Act of July 22, 1958. Section 2 of that Act, which provides the authority for a judicial determination of the issue, speaks of "exclusive interest" and not "exclusive use and occupancy." Had Congress intended to make actual exclusive use and occupancy the sole test, it would have

been easy for it to have so stated in the legislation.

Actual use and occupancy of land, without more, has no connotation of rightful possession. A trespasser may have actual use and occupancy of land. Indians may obtain actual use and occupancy of reservation lands belonging to other Indians by just moving in without any semblance or color of right. Or they may obtain such use and occupancy through invalid administrative action.

Similarly, even though use and occupancy is rightful, the fact that it is actually exclusive does not connote that the exclusive nature of the use and occupancy is rightful. Persons having the right to share lands with others may, by force or other illegal means, shoulder out the others and gain actual exclusive use.

But Congress was not interested in recognizing claims based on force or other illegal action. In section 1 of the Act of July 22, 1958, the 1882 reservation was declared to be held in trust for Indians who had established rightful claims thereto, either by virtue of the Executive Order of December 16, 1882, or by virtue of Secretarial settlement subsequent to that date. An indicated purpose of the litigation thereby authorized, as set out in section 1, was to determine the "rights and interests" of the parties, not the fact of actual use and occupancy of the lands in question.

Another indicated purpose of the litigation, as set out in section 1, was to quiet title to the lands in the tribes or Indians establishing "such claims pursuant to such Executive order as may be just and fair in law and equity." Here, again, the authority was referenced to claims cognizable in law and equity. Section 2, as noted above, makes use of the term "exclusive interest," instead of "exclusive use and occupancy."

Defendant calls attention to a Committee Report comprising a part of the

---

71. The Navajos contend that this area is larger than that part of the reservation lying outside of district 6, as defined on April 24, 1943, but we have found and concluded that no Navajos were settled by Secretarial action within district 6 as so defined.

legislative history of the Act of July 22, 1958,[72] in which the Committee used these words: " * * * Because of the nature of the conflicting claims of use and occupancy interests. * * * "

We do not share defendant's view as to the significance of the quoted words. It is true that the claims in question relate to use and occupancy. But, as even this excerpt indicates, the claims must be of a kind which properly may be characterized as interests in land. An interest in land may be subject to paramount rightful claims, as in this case, where the claim of the United States was paramount prior to July 22, 1958. But, except for paramount rightful claims, an interest in land is one which is enforceable in court because it is grounded on recognized principles of law.

The principle of law which must be applied with reference to the Navajo claim to an exclusive interest in part of the reservation is that prior rights continue until lawfully terminated. On December 16, 1882, as we have concluded, the Hopis obtained non-exclusive rights of use and occupancy in the entire reservation. We have concluded that the Navajos obtained no rights in the reservation at that time and that, with immaterial exceptions, their only rights acquired by Secretarial settlement first came into existence in 1931.

Hence the Navajo rights are not exclusive as to any part of the reservation unless the pre-existing Hopi rights therein were lawfully terminated. As we see it, the Hopi rights could be lawfully terminated only by Congressional enactment, valid administrative action, or abandonment. Each of these possibilities will be explored later in this opinion.

Defendant contends that the Enabling Act of July 22, 1958, does not establish one criterion for the Hopis and another for the Navajos. Accordingly, it is argued, if proof of actual exclusive use and occupancy is enough to establish that the Hopis have an exclusive interest in part of the reservation, it is enough to establish that the Navajos have the exclusive interest in the remainder.

We have not held that proof of exclusive Hopi use and occupancy of district 6 is enough to establish an exclusive Hopi interest in the district 6 area. In addition to exclusive Hopi use and occupancy it was also established that they gained rights of use and occupancy therein (and in the entire reservation) by the self-operating effect of the December 16, 1882 order. It was also established that the Secretary had not settled any Navajos in the district 6 area.

A different criterion must be applied in evaluating the Navajo claim to an exclusive interest because their claim rests on a different foundation than that which supports the Hopi claim. The Hopi claim to an exclusive interest in the district 6 area rests on rights gained in 1882, undiminished by subsequent Secretarial settlement of other Indians. The Navajo claim to an exclusive interest in part of the reservation must rest on rights gained in 1931 and thereafter plus lawful termination of pre-existing Hopi rights.

We now proceed to consider whether, as to that part of the 1882 reservation lying outside of district 6, the Hopi rights of use and occupancy, acquired on December 16, 1882, were ever lawfully terminated. As before indicated, this could only have been brought about by Congressional enactment, valid administrative action, or abandonment.

Turning first to Congressional enactments, it appears that on several occasions the question was raised as to whether the Hopi interest in part of the 1882 reservation should be legislatively terminated.

The first such occasion was in 1920, when the House Committee on Indian Affairs held hearings at Keams Canyon and Polacca, in the reservation, to investigate the conflicting claims of the. Hopis and Navajos. The then Congressman Hayden inquired at this hearing as to whether

---

72. H.R.Report No. 1942, 85th Cong. 2nd Sess., on S. 692.

it was advisable to "lay out a separate reservation for the Hopi Indians, which will be theirs and free from further encroachment from the Navajos?" Robert L. Daniel, the Hopi School Superintendent at Keams Canyon, indicated that this would be desirable. No legislation of this character, however, resulted from this committee hearing.

The Senate Committee on Indian Affairs held hearings at Keams Canyon, Toreva, Hotevilla, Oraibi (within the reservation), and Tuba City, Arizona, in April and May of 1931. Hopi Superintendent Miller and Navajo witnesses urged that a division of the 1882 reservation be effectuated. But Congress took no action at that time.

While the Navajo Indian Reservation Act of June 14, 1934, 48 Stat. 960, was before Congress, the Department sought to include language which would have terminated Hopi rights in a large part of the reservation. As stated earlier in this opinion, this language was finally withdrawn, and instead, there was inserted in section 1 of that Act the words: " * * however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882. * * * "

While the bill (S. 2734; H.R. 3178, 81st Cong.) which was to become the Navajo-Hopi Rehabilitation Act of April 19, 1950, 64 Stat. 44, was before the House Subcommittee on Indian Affairs, the matter of dividing the 1882 reservation was discussed. Congressman Morris asked Theodore H. Haas, Chief Counsel of the Bureau of Indian Affairs, if Congress should attempt any settlement of the issue in that bill. Haas replied: "I should recommend most decidedly against bringing in this difficult, extraneous issue which would cause the resentment and opposition of the Navahos and Hopis."

The committee also had before it a letter from the Commissioner of Indian Affairs recommending against inclusion in the pending bill of any provision dealing with the 1882 reservation boundary problem. No such provision was included in that bill.

During the years subsequent to 1931 there were numerous appropriation bills in which funds were appropriated for the construction and maintenance of schools for Navajo children. As previously stated, a number of these schools were built within the 1882 reservation, beginning with the school at Pinon, erected in 1935. Federal funds, appropriated by Congress, were also utilized for the supervision of Navajo affairs and activities, and the rendition of aid to Navajos, within the reservation area.

The appropriation acts themselves, however, do not specifically mention a segregation of administration of Navajo and Hopi affairs in the 1882 reservation. Nor do any of them contain any declaration or other provision indicating an intent to terminate Hopi rights.

It therefore appears that the only occasion during this entire period on which the Congress legislatively dealt specifically with the problem (the Navajo Indian Reservation Act of June 14, 1934), it inserted a provision expressly disclaiming any intent to terminate Hopi rights and interests. As late as 1950, while the Navajo-Hopi Rehabilitation Act was under consideration, the boundary matter was considered an open question not previously resolved by Congress.

We conclude that Congress at no time enacted legislation designed to, or having the effect of, terminating Hopi rights of use and occupancy anywhere in the 1882 reservation.

We next consider whether the Hopi rights of use and occupancy, established on December 16, 1882, were at any time terminated by valid administrative action.

Since, with indicated immaterial exceptions, no Navajos or other non-Hopi Indians were settled in the reservation prior to February 7, 1931, there was no occasion prior to that date for adminis-

trative action designed to terminate Hopi rights in any part of the reservation. It is therefore not surprising that the record is barren of any evidence that administrative action of this kind was taken prior to 1931.[73]

Beginning on February 7, 1931, administrative officials followed a policy designed to exclude Hopis, for the most part, from those parts of the 1882 reservation not immediately adjacent to their villages. At the outset it was sought to accomplish this by legislation in the form of a provision in the bill which was to become the Navajo Indian Reservation Act of 1934, describing the area of concentrated Hopi population as an exclusive Hopi reservation. Had this been accomplished, the Hopis would unquestionably have been legally ousted from the remainder of the 1882 reservation.

But this way of effectuating the indicated administrative policy failed of realization when the Department of the Interior found it necessary to revise the language of the proposed Navajo Indian Reservation Act. Thereafter, administrative efforts to exclude Hopis from parts of the reservation not immediately adjacent to their villages, took the form of administrative regulations and practices pertaining to land use. None of these administrative regulations and practices, however, with the possible exception of the abortive effort to obtain a Secretarial order in 1941 defining areas of exclusive occupancy, were designed to affect whatever rights the Hopis then had in the entire 1882 reservation.

This is established beyond question by the representations repeatedly and consistently made by departmental officials throughout this entire period, beginning on February 17, 1937. On that date Allan G. Harper submitted a plan of administrative interrelationships between the Hopi and Navajo jurisdictions. This plan, which was approved by the Commissioner on March 16, 1937, contains this statement:

"* * * This arrangement will be tentative until the definite boundary of the Hopi-Navajo reservation shall have been determined. This arrangement is established as a matter of administrative expediency and convenience and shall not be construed in any way as fixing an official boundary between the two tribes, or as prejudging in any way the boundary which is ultimately established."

On December 28, 1937, the Commissioner signed and promulgated a map defining land-management districts. In advising Navajo Superintendent Fryer of this action, the Commissioner stated:

"It is understood, also, and it should be clearly explained to the Navajo and the Hopi counsels [sic], that a delineation of District 6 is not a delineation of a boundary for the Hopi Tribe, but is exclusively a delineation of a land-management unit."

On July 13, 1938, Commissioner Collier and six of his staff officials met with Hopi leaders at Oraibi, Arizona. The practice had by then already been established whereby Hopis could not go outside of district 6, as then tentatively established, without first obtaining a Government permit. Commissioner Collier explained to the Hopis on this occasion that the permit system was a part of the grazing regulation procedure, adding: "That has nothing to do with the reservation boundary." At another point during this conference the Commissioner stated that nothing with regard to the plan for the administration of district 6, as outlined by him on that occasion, "* * * predetermines or settles anything with regard to the ultimate Hopi Tribal boundary. * * *"

On April 24 and 25, 1939, four Hopi leaders met with the Commissioner and

---

73. For the reasons indicated later in this opinion administrative action of this character would not have been legally possible, without Congressional approval, after March 3, 1927, in view of section 4 (25 U.S.C. § 398d) of the act of that date, 44 Stat. 1347.

other agency officials in Washington, for the purpose of presenting their land claims. Discussing the question of the division of the reservation into "use" areas, the Commissioner assured the Hopis that: "any agreement which is made of use-rights will not be a giving up of this claim." Continuing, the Commissioner stated:

> "The creation of district 6 was not a finding as to what area the Hopis should occupy. The Hopis were not consulted. The making of the true finding is in the future."

On September 4, 1941, the Office of Indian Affairs ruled that proposed changes in the boundaries of district 6 should be submitted to the Hopi Tribal Council for consideration and approval. At this time Assistant Commissioner William Zimmerman, Jr., informed Navajo Superintendent Fryer that the proposed adjustment in the boundary could not "be considered as a permanent adjustment of the reservation boundary but must be considered merely as a change in the land management district." [74]

In a memorandum to the Forestry and Grazing Division, J. M. Stewart, Director of Lands, Office of Indian Affairs, dated October 9, 1941, it was stated:

> " * * * the establishment of such land use areas must not be confused with the establishment of reservation boundaries, as such reservation boundaries can be established only by Act of Congress. * * * "

In a letter dated October 12, 1941, signed by the Commissioner and approved by the Assistant Secretary, Seth Wilson, Superintendent of the Hopi Agency, was told that " * * * the proposed change in the boundary of District 6 has no bearing on the establishment of the reservation boundary. * * * "

In his report of July 29, 1942, Willard R. Centerwall, who had been commissioned to conduct a new study of the Hopi-Navajo boundary problem, submitted new boundary descriptions which, with modifications, were approved on April 24, 1943, as the revised lines of district 6. In this report Centerwall stated that it must be clearly understood that the setting aside of a land management unit for the Hopi Indians:

> " * * * does not create a reservation boundary, since the Hopis would remain entitled to all beneficial use, including the right to any proceeds within the remainder of the 1882 Executive Order Reservation." [75]

On February 14, 1945, Assistant Commissioner Walter V. Woehlke informed Hopi Superintendent Burton A. Ladd that construction of fences along the revised district 6 line was designed to protect the interest of Hopi stockmen and to prevent additional encroachments of Navajo livestock on Hopi ranges. "In our judgment," Woehlke wrote, "the proposed fences will have no effect on Hopi land claims, but will prove to be a great practical value to the Hopi stockmen."

William A. Brophy, who succeeded Collier as Commissioner of Indian Affairs, gave Hopi leaders the same assurance on April 26, 1945. He stated:

> "I want to assure that any fences built will in no wise be construed as establishing district 6 as the Hopi Reservation, or jeopardize any claims which you may have to other lands. The purpose of the fence is not to mark off the boundaries of the reservation, but merely to prevent cattle and horses from straying; to assist

---

74. As noted earlier in this opinion, the Hopi Tribal Council did not approve this change.

75. In arriving at adjustments in the Centerwall district 6 lines, the Navajo and Hopi superintendents agreed on certain principles to be applied, one of which was that the principal purpose of the establishment of the adjusted district 6 line was the erection of a barrier which would prevent the crowding in of new families of Navajos onto territory used by the Hopis.

the stockmen in improving the quality of their herds, and in controlling the breeding program by preventing inferior sires from mixing with the herds."

Again, on May 3, 1945, the Commissioner gave the same assurance to Senator Burton K. Wheeler. Commenting upon a complaint the Senator had received from the Hopis concerning the fencing of district 6, the Commissioner stated:

"* * * In the 1880s by Executive Order an area of about 3,000,000 acres, with the Hopi villages in the center, was set aside as a reservation for the Hopis and such other Indians as the Secretary might designate. At the time of the establishment of the Hopi Reservation several thousand Navajos were already using a large part of the area. The Navajo population grew faster than the Hopi population with the resulting gradual encroachment of Navajos upon the areas used by the Hopis, especially by Hopi livestock. In order to protect the Hopis against additional encroachment by Navajo livestock upon the Hopi range, certain limits were established beyond which Navajo livestock would not be allowed to graze. This was in no sense an establishment of boundary lines of the Hopi Reservation. Those boundary lines still are the lines of the Executive Order reservation." [76]

At a later point in the same letter, Senator Wheeler was told:

"* * * They [Hopis] have been assured several times that these fences do not establish any boundary line for the Hopi Reservation and that no new delimitation of the reservation boundaries is intended."

On May 12, 1948, Acting Commissioner William Zimmerman, Jr., wrote to an interested citizen:

"* * * I wish to assure you that the establishment of District 6 does not modify in any way Hopi rights in the Executive Order Reservation of 1882. * * *"

In view of these repeated administrative assurances as to the limited purpose in establishing and fencing district 6, and the express disavowal during all of these years of any intent to affect Hopi rights and interests in the entire 1882 reservation, the contention that the Department sought termination of Hopi rights outside of district 6 is without factual foundation.

But even if this had been the purpose of the Department, the question remains whether this could have been legally accomplished without a Congressional enactment.

Secretarial settlement of the Navajo Indian Tribe, and of individual Navajo Indians, with exceptions which must be disregarded for reasons already stated, did not occur prior to February 7, 1931. By that time there were in effect two statutes bearing upon the power of administrative agencies to create new reservations, and to make additions to or change the boundaries of existing reservations.

The first of these is the Act of May 25, 1918, section 2 of which (25 U.S.C. § 211), provides that no Indian reservation shall be created, nor shall any additions be made to one heretofore created, within the limits of the States of New Mexico and Arizona, except by Act of Congress.

■ In his opinion of February 12, 1941, the solicitor of the Department of

---

76. Defendant argues that, in view of the context, the Commissioner was here referring to an "undefined inner boundary between the Hopis and the Navajos within the Executive Order area," rather than the boundary lines of the 1882 reservation. We do not agree.

It is also to be noted that the Commissioner's statement in this letter that "several thousand Navajoes were already using a large part of the area" in 1882, was in error, since there were then not more than three hundred Navajos in the 1882 reservation area.

the Interior ruled that the proposed Secretarial order then under consideration, whereby the 1882 reservation would be divided into areas of exclusive Hopi and Navajo occupancy, would be contrary to the prohibitions set out in the 1918 Act.

We are in full agreement with this view. Moreover, we think the conclusion must be the same whether the claimed administrative division of the 1882 reservation rests on a formal departmental order (which was sought but disapproved in 1941, and never again sought), or on a course of official conduct from which such a division is sought to be implied.[77]

 An Indian reservation consists of land validly set apart for the use of Indians, under the superintendence of the Government, which retains title to the lands. United States v. McGowan, 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410. Where there is no statutory prohibition such as that here under consideration, the setting aside of a reservation may be effectuated by the Secretary of the Interior, since the acts of the heads of departments are the acts of the executive. United States v. Walker River Irrigation District, 9 Cir., 104 F.2d 334, 338.

At the time the Navajo Indian Tribe and individual Navajo Indians were settled in that part of the 1882 reservation lying outside district 6, as defined in 1943, the Hopis already had rights of use and occupancy in that part. Thus, absent possible prior Hopi abandonment, to be discussed below, the initial legal status of settled Navajos must have been that of Indians entitled to share, with the Hopis, in the use and occupancy of part of the 1882 reservation. Had the Department thereafter sought to terminate all rights of the Hopis in that part, thereby giving the Navajos exclusive rights therein, the result would have been to create a new reservation for the exclusive use of Navajos.[78]

If such action would not have created a new reservation for the Navajos, it would at least have operated to add lands to their existing contiguous Arizona Navajo reservation. Either result would be contrary to the 1918 act.

Defendant argues that the authority of the Secretary to settle other Indians in the 1882 reservation was not terminated by the 1918 act. With this we agree. But the question now under discussion is whether, after that enactment, the Secretary could, in connection with his acts of settlement or otherwise, change the character of the 1882 reservation to the extent of terminating rights therein which the Hopis had held since December 16, 1882, thus establishing the area as one for the exclusive use of settled Navajos. We hold that such a result was not administratively attainable after May 25, 1918.[79]

Defendant also argues, in effect, that if the 1918 act had been considered by the Congress to have had the effect the solicitor attributed to it, "the Enabling Act, approved July 22, 1958, would not have submitted to this court, as it did, the burden of hearing and determining all claims, including Navajo claims of settlement which are grounded upon settlement within the Executive Order area after May 25, 1918. * * *"

---

77. We have indicated above our reasons for believing that there was no course of official conduct from which an intention to bring about such a result could be implied, and that, in fact, such a result would be contrary to the repeated and express representations of authorized officials.

78. Expressing the same view, the solicitor said:
"* * * Since the effect of an order creating a reservation is to give the Indians the use and occupancy of the land, an order giving certain Indians the use and occupancy of a designated area of land is, in effect, the creation of a reservation. This conclusion is true a fortiori where the effect is to give a tribe of Indians an exclusive right of use and occupancy in an area which was part of a larger area in which they had the right of use and occupancy in common with other Indians settled thereon."

79. Defendant's statement, on page 13 of his reply brief, that the 1918 act "has no application to existing reservations, either those created by Statute or by Executive Order," is in error.

Under the solicitor's ruling, and under our like ruling, the 1918 act is held to foreclose administrative termination of Hopi rights in any part of the 1882 reservation, and establishment of exclusive Navajo rights in part of the reservation, after May 25, 1918. Congress did not know, when it passed the Act of July 22, 1958, what rights, if any, the Hopis would be declared to have in the reservation, the extent to which Navajo claims would be based on events after May 25, 1918; or the extent to which Navajo claims, if established on the basis of events subsequent to that date, would be held to be joint or exclusive in character. Thus the 1958 enactment represents no expression of Congressional opinion as to the meaning of the 1918 act, or the effect it might have on the outcome of this case.

 The second statute which has a bearing on the question now under discussion, is section 4 of the Act of March 3, 1927, 25 U.S.C. § 398d. This statute provides that changes in the boundaries of reservations created by executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress, with the proviso that the Secretary may make temporary withdrawals.

In his opinion of February 21, 1941, the solicitor relied upon this act, as well as the 1918 act, in ruling that the Secretary was without power to divide the 1882 reservation into areas of exclusive Hopi and Navajo occupancy. In his opinion:

"The proposed order would not only change the boundaries of the 1882 reservation but would also, in effect, create a Hopi Reservation where no reservation exclusively for the Hopis had previously existed, and would thus violate the prohibition in the 1918 act against the creation of any reservation within the

limits of the State of Arizona except by act of Congress." [80]

Again, we are in accord with the views expressed by the solicitor. Had the department, at any time after the 1927 statute became effective, sought to terminate Hopi rights in part of the 1882 reservation, so that such part would be for the exclusive use of the Navajo Indian Tribe or individual Navajo Indians, the result would have been to change the boundaries of the 1882 reservation by dividing it in two. In addition, there would have been, in effect, a change in the boundaries of the contiguous Navajo reservation, to include that part of the 1882 reservation in which Navajos were granted exclusive rights.

For the reasons indicated we hold that the Hopi rights of use and occupancy in that part of the 1882 reservation in which Navajos were settled were at no time terminated by valid administrative action, although after February 7, 1931, the Hopis were required to share equally, use and occupancy thereof, with Navajos validly settled in that part of the reservation.

 Defendant argues, however, that even if the department was without authority and even if it acted in a tortious manner, the fact that the department protected the Navajos in the exclusive use and occupancy of a large part of the reservation, conferred upon the Navajos all the normal incidents of ownership which go with Indian title. Arguing from this that the Hopis now, at best, have a claim against the Government for a taking, defendant cites United States v. Shoshone Tribe, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360, 304 U.S. 111, 116, 58 S.Ct. 794, 797, 82 L.Ed. 1213. Our attention is specifically directed to this language in the latter opinion: " * * * for all practical purposes, the tribe owned the land."

---

80. Our ruling herein that the Hopis have the exclusive interest in that part of the 1882 reservation consisting of district 6, as defined in 1943, does not run counter to the solicitor's quoted view. Our opinion as to this is not predicated on any administrative action purporting to terminate existing Navajo rights in that part of the reservation. Rather, it is based on the fact that no Navajos were settled therein, and hence never acquired any interest in that part of the reservation.

The Shoshone Tribe of Indians of the Wind River Reservation in Wyoming sued the United States in the Court of Claims for the breach of treaty stipulations, whereby the tribe had been permanently excluded from the possession and enjoyment of an undivided half interest in the tribal lands. By the treaty of July 3, 1868, 15 Stat. 673, the Shoshone Tribe relinquished to the United States a reservation of 44,672,000 acres in Colorado, Utah, Idaho and Wyoming, and accepted in exchange a reservation of 3,-054,182 acres in Wyoming. The United States agreed that the territory described in the treaty would be "set apart for the absolute and undisturbed use and occupation of the Shoshone Indians * * * and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them."

In 1878, acting upon the erroneous assumption by the Commissioner of Indian Affairs that the Shoshones had consented to the settlement of a band of the Northern Arapahoes on the Wind River Reservation, that band was brought to the reservation under military escort. The Shoshones immediately made known their opposition to this arrangement, but the Indian Commissioner persisted in protecting the Arapahoes in permanent residence in that reservation.

The agent on the reservation frequently communicated to the Washington office the protests of the Shoshones, but there was nothing in return but silence. "Months lengthened into years," the Supreme Court said (299 U.S. at page 488, 57 S.Ct. at page 247), "and the signs accumulated steadily that the Arapahoes were there to stay." Schools were built, irrigation ditches were dug, and in numberless ways the Arapahoes were officially treated as if they had equality of right and privilege with the Shoshones.

On August 13, 1891, the Commissioner officially ruled that the Arapahoes have equal rights with the Shoshones to the land in the reservation. Both that office and Congress thereafter dealt with the reservation and the two tribes as if the Arapahoes were there permanently and rightfully. In time the Arapahoes came into exclusive possession of the eastern section of the reservation, pushing the Shoshones to the west. Finally, in 1927, an act was passed to make atonement for the wrongs of half a century by permitting the Shoshones to prosecute a claim for damages in the Court of Claims. Act of March 3, 1927, 44 Stat. 1349, Part II.

The Court of Claims gave judgment for the Shoshones in the amount of $793,821.-49. Both the Government and the Shoshones appealed. The Government did not contest the merits of the claim but only the amount awarded.

It was in this context that the court, in the first Shoshone case, 299 U.S. 476, held in effect that, by adopting the wrongful act of a Government officer, the United States appropriated part of the Shoshone reservation in 1878. As the Court of Claims had based the award on a supposed taking as of August, 1891, the cause was remanded for a redetermination of damages. The Court of Claims then raised the award to $4,408,444.23, and this judgment was affirmed in 304 U.S. 112, 57 S.Ct. 244.

On the second appeal the only question presented was whether the Court of Claims erred in holding that the right of the Shoshone Tribe, which had been taken, included the timber and mineral resources within the reservation. The Supreme Court held that it did, rejecting the contention that these resources belonged to the Government.

When the Supreme Court said, in this second opinion, at page 116, 58 S.Ct. at page 797 that " * * * for all practical purposes, the tribe owned the land," it was speaking of the rights of the tribe for whom the reservation was set aside—there the Shoshones. It was not referring to rights acquired by a trespassing tribe with the tortious assistance of Government officials. Thus the Shoshone case does not support the view that because the Navajos, in rightful occupancy of 1882 reservation lands through Secre-

tarial settlement, were thereafter secured in the exclusive use and occupancy of that land by the enforcement of an invalid permit system, the Navajos thereby gained an exclusive interest in the land.

Apart from this, there are obvious substantial distinctions between the Shoshone case and our case. The Shoshone case was a suit for damages by reason of the taking of lands obtained by treaty, it was not a suit against the other tribe to quiet title to reservation lands. In the Shoshone case the Government had no right to settle any other Indians in the reservation without the consent of the Shoshones. Here the consent of the Hopis was not required in order for the Secretary to settle Navajos in the 1882 reservation.

In the Shoshone case, it was the official position of the Government throughout, speaking administratively and legislatively, that the Arapahoes had the right to use and occupy the reservation. Here, the Government has never taken the position that the Navajos had the exclusive interest in any part of the reservation. Exclusive Navajo use and occupancy has at all times been justified only as a necessary grazing regulation, the intent to affect Hopi rights being officially disclaimed time after time.

We conclude that the Shoshone case does not support defendant's position that the Navajos have gained an exclusive interest in the 1882 reservation by Congressional or administrative action.

This leaves for determination the question of whether those Hopi rights were terminated by abandonment.

Arguing that the Hopis had no more than an interest that depended for its existence on occupancy and use, defendant contends that the Hopis lost this possessory right by failure to exercise it, prior to or after the settlement of Navajos.

In support of this argument defendant relies on that part of the opinion in The Crow Nation v. United States, 81 Ct.Cls. 238, 278, which is set out in the margin.[81]

Defendant states that this decision has been modified by subsequent Supreme Court opinions clearly establishing the rule that title to executive order reservations carries with it all the incidents of ownership. It contends, however, that Indian title to an executive order area is in the nature of tenancy by sufferance, citing Hynes v. Grimes Packing Co., 337 U.S. 86, 103, 69 S.Ct. 968, 93 L.Ed. 1231.

We have already stated in this opinion and in our prior opinion, that rights under an unconfirmed executive order reservation are not vested, and are in the nature of a tenancy by sufferance. But this does not answer the question of whether, under the facts of this case, the failure of the Hopis to occupy and use all of the 1882 reservation, as distinguished from Government action, operated to terminate their non-vested right to do so, accorded to them by the Executive Order of December 16, 1882.

There is nothing in the facts or law of the Crow Nation decision to support the view that such non-user by the Hopis brought about a termination of such rights. In that case it appears that on July 5, 1873, the President had ordered that a tract of land, consisting of 23,000,-000 acres, situated in the Territory of Dakota, be set apart as a reservation for the Gros Ventres, Piegans, Bloods, Black-

---

81. " * * * the order of 1873 and the act of Congress of 1874 gave to the River Crows only the right to reside upon the reservation, so set apart by Executive order, and did not confer upon them any definite title or particular interest in the land. It was in the nature of a tenancy by sufferance or residential title. * * * In all subsequent proclamations of the President which were ratified by acts of Congress, the River Crows were never recognized as having an interest in the area so set apart by this Executive order of 1873. It was simply a license or permission granted by the Government which could be withdrawn and ceased to exist when the River Crows returned to the Crow Nation Reservation. The Executive order reserves to the President the right to put other Indians on the reservation and this could not be done if a statutory title, as tenants in common, was given to these five tribes alone."

feet, River Crows, "and such other Indians as the President may, from time to time, see fit to locate thereon." This executive order was confirmed by Congress in the Act of April 15, 1874, 18 Stat. 28.

The River Crows then had their own reservation along with the Mountain Crows, and had lived therein from 1851 to 1859. In the latter year the River Crows went to the territory later described in the 1873 executive order. The purpose in creating the 1873 executive order reservation was to prevent hostilities among the tribes hunting and fishing in this territory, and to control the liquor traffic on the Missouri River.

In 1897 the River Crows finally returned to their pre-existing reservation and did not again use or occupy the 1873 executive order lands. The action of the River Crows in leaving the 1873 lands was voluntary, no force or coercion being exercised by the Government. The greater part of the 1873 lands was subsequently returned to the public domain by agreements entered into with the named tribes then living on the 1873 lands, which did not include the River Crows.

On these and other facts the River Crows made a claim against the Government for the value of their alleged interests in the 1873 lands. Rejecting this claim the court held that, under the facts, it was the clear intention of Congress and the executive departments that the River Crows were to take no interest in the 1873 reservation. Their abode thereon, the court ruled, was solely a temporary expedient in order to avoid bloodshed and to regulate the liquor traffic on the Missouri River.

The facts concerning the establishment of the instant 1882 reservation, and the use made thereof by the Hopis, are entirely different from those pertaining to the creation and use, by the River Crows, of the reservation involved in The Crow Nation v. United States, supra.

Here the reservation was not intended as a temporary expedient, but as a permanent reservation for the Hopis (who had no other reservation), and such other Indians as the Secretary might see fit to settle thereon. Here, unlike the Crow Nation case, one of the prime purposes was to provide the Hopis with living space in addition to that which they were actually occupying in 1882, before encroaching white settlers and Navajos made this impossible. Here there was no movement by the Hopis from the part of the reservation which defendant asserts the Hopis abandoned.

The issue of abandonment is one of "intention to relinquish, surrender, and unreservedly give up all claims to title to the lands. * * *" Fort Berthold Indians v. United States, 71 Ct.Cls. 308, 334. As the court stated in the Fort Berthold Indians case, the determination as to whether there was such an intention in a particular case depends on the facts and circumstances of that case.

It is true that the Hopis have never made much use of the part of the 1882 reservation outside of district 6 for residence or grazing purposes. But non-user alone, as the court said in the case last cited (at page 334), is not sufficient to warrant a finding of abandonment. The non-user must be of such character or be accompanied by such other circumstances as to demonstrate a clear intention to abandon the lands not used.

The failure of the Hopis, prior to the settlement of Navajos, to use a substantially larger part of the 1882 reservation than is embraced within district 6, was not the result of a free choice on their part. It was due to fear of the encircling Navajos and inability to cope with Navajo pressure.

We have outlined above the evidence pertaining to Navajo depredations against, and pressure upon the Hopis for the years prior to 1900. That this state of affairs continued for the thirty years which followed, prior to the official settlement of Navajos in the reservation, is equally well established in this record.

In his annual report of September 1, 1900, Charles E. Burton, school superintendent and acting Indian Agent at

Keams Canyon, reported that the Navajos had been allowed to encroach upon "the Hopi Reservation" for years, taking possession of the best watering places, best farming and best pasture land.

On July 10, 1908, Matthew W. Murphy, special allotting agent, reported:

> " * * * I find practically all the springs in the possession of the Navajos, and I find Navajos living within three miles of some of the Moqui villages."

In his letter of February 14, 1911, recommending discontinuance of the second allotment project, A. L. Lawshe, Hopi Superintendent, observed that the only valid argument which could be made in favor of allotments "is that it would put a stop to the gradual encroachment of the Navajos upon the Hopi people."

On May 26, 1914, H. F. Robinson, Superintendent of Irrigation for the Land Division, stated that the Hopis desired to move out further with their livestock. But they found that the "thrifty and pushing Navajos have preempted their land and water and by gradual but continued encroachments has [sic] hemmed them in. * * *" Characterizing the Hopis as peaceful and submissive, Robinson reported that they were discouraged "and feel that they are being crowded to the wall. * * *"

On July 7, 1915, Leo Crane, Superintendent at Keams Canyon, reported to Washington that the problem was becoming "acute, as respects the depredations of Navajo Indians upon Hopi herds, and general differences arising because of overlapping grazing areas."

On April 6, 1916, the then Congressman Carl Hayden wrote to the then Commissioner Cato Sells stating it to be his understanding "that the Navajoes are crowding in upon these inoffensive people [Hopis] and are depriving them of the use of considerable areas that are necessary for grazing their flocks."

Inspector H. S. Traylor was assigned to make an investigation and report concerning Congressman Hayden's charges. In his report, filed June 6, 1916, Traylor stated that the Congressman's accusations concerning the Navajo's encroachment upon territory rightfully belonging to the Hopis were true. Calling attention to the arid nature of the area and the fact that springs and wells were sparse, Traylor said that: "To secure this water to supply his flocks and herds the bold Navajo has occupied the greater part of these washes and forced the Hopi back to the mesas upon which he has his villages."

In a report submitted on March 12, 1918, Leo Crane expressed the view that the Hopis had been disciplined and advanced and had prospered because they could be reached. The Navajos, on the other hand, "may encroach, rob, kill cattle, etc., and then has 3,200 square miles of most inhospitable country in which to hide away." Crane added that the Navajos "have never respected anything save one thing—the uniform of the United States Cavalry."

On August 23, 1918, Crane again reported at length concerning Navajo depredations and the need of effective enforcement. On November 10, 1918, H. F. Robinson sent a similar report to the Commissioner, stating that the "encroachments of the Navajo Indians on the lands occupied by the Hopi Indians on the Moqui Reservation in Arizona is [sic] becoming more acute. * * *"

On October 15, 1921, General Hugh L. Scott, a member of the Board of Indian Commissioners, reported that the Navajos were then encroaching upon the Hopis as they were when he was in the area in 1911. "The Hopi looks in vain to the Department for protection," he wrote, "for although aware of this condition for many years the Government has continued to neglect its duty in providing a remedy."

On January 7, 1925, Inspector A. L. Dorrington filed a report in which the old story was repeated. " * * * the Navajo Indians," he wrote, "do not recognize any boundaries and have persistently and continuously for fifty years or more crowded the Hopi Indians back and back, until they are now confined to

comparatively small area immediately adjoining their mesas. * * * "

During all of these years the Government, while failing to protect the Hopis from the Navajos, was urging the Hopis to come down off of the mesas.[82] Despite this lack of protection Government officials more than once chided the Hopis for clinging to the mesa tops. In his report of June 22, 1914, Crane in effect stated that the Hopis were to blame for their troubles. Whereas the Navajos had an "industrious pushing nature," Crane observed, the Hopis, through indifference, timidity or superstition, persistently clung to the mesas.

In his report of June 6, 1916, Traylor placed much of the blame for Navajo encroachments upon territory "rightfully" belonging to the Hopis, upon the Hopis themselves. He characterized the Hopi as "the most pitiable and contemptible coward who now lives upon the face of the earth." [83]

In the late 1920's and early 1930's the Hopis, overcoming their fears of the Navajos, and yielding to the constant urging of Government officials, began to come down off of the mesas and spread beyond their previous area of occupancy.[84]

On January 16, 1928, Miller reported that during the previous year:

" * * * the Hopis have spread out so much, and we have located so many so far afield—and at such distances from their mesas—in new territories, that additional friction and misunderstanding has developed, and more determined opposition from the Navajos has been encountered. * * * "

On July 12, 1930, Agricultural Extension Agent A. G. Hutton reported that, "the Hopi is crowding into territory that has been used entirely by the Navajos in the past. * * * "

On July 25, 1930, Field Representative H. H. Fiske reported that the efforts of the Government over a long period of time to induce the Hopis to move down from the mesa villages was resulting in some gradual but increasing success.

But now that the Hopis, who had previously been labeled cowards for not coming down off of the mesas, saw fit to do so at Government urging, they were officially labeled "aggressors" and "trespassers" for doing so. In his report of July 25, 1930, Fiske stated that now the Hopis rather than the Navajos, were the aggressors. In their report of November 20, 1930, H. J. Hagerman and Chester E. Faris agreed with the view which had previously been expressed by Miller, Hutton and Fiske that most of the then-current "trespassing" was by the Hopis rather than the Navajos.

After the official settlement of Navajos in the 1882 reservation, the failure of the Hopis to make substantial use of the area beyond district 6 was not due to a lack of desire or a disclaimer of rights on their part. It was due to the fact that

82. As early as January, 1886, Thomas V. Keam had recommended to the Commissioner of Indian Affairs that the Hopis be encouraged to move down off of their mesa tops to the nearby valleys so that they would be closer to their farms and sources of water. To assist in this, it was his suggestion that the Government supply the Hopis with building materials to enable them to build wood homes in place of their adobe pueblo dwellings. The Government accepted this suggestion and the first two Hopi families moved down off of the mesas in 1888.

83. Traylor added:
"Were he otherwise than the coward that he is, he would prefer to die fighting rather than to surrender the resources of his territory to an enemy."

84. There had apparently been some substantial expansion of the Hopis as early as 1917. Speaking of this period, Asdzaan Tsedeshkidni, a ninety-year-old Navajo woman, testified that about this time she and her family had been living in the reservation near Beautiful Mountain, where they had developed a spring. She testified that then we "heard the rumble of the Hopi hoes," as the latter began developing little farms in the area. So she and her family moved across Dinnebito Wash.

the Office of Indian Affairs, through its grazing regulations and associated permit system, was exerting the power of the Government to prevent any Hopi expansion into the area into which Navajos by then were solidly entrenched.

The administrative exclusion of Hopi Indians, without their approval and against their wishes, from that part of the 1882 reservation lying outside of district 6 was, for the reasons already stated, at all times illegal.[85] The Office of Indian Affairs was aware of this because the solicitor's opinion of February 12, 1941, reconfirmed by the acting solicitor's opinion of June 11, 1946, 59 I.D. 248, so advised. Yet the exclusion practice continued year after year and was, in fact, intensified.

But despite this obstacle over which the Hopis had no control, they continued to assert their right to use and occupy the area from which they were barred.

At a Senate subcommittee hearing held at Keams Canyon in May, 1931, the Hopi tribal delegates insisted that the 1882 reservation should be for the exclusive use of the Hopis and that all Navajos should be moved out.

On August 6, 1932, a conference of sixty-eight Hopis, meeting at Oraibi, Arizona, protested against the inclusion in the Navajo Indian Reservation Act then under consideration, of a proviso which would have given the Secretary of the Interior authority to determine and set apart for the exclusive use of the

Hopis, only a portion of the 1882 reservation.

On February 13, 1933, Otto Lomavitu, then President of the Hopi Tribal Council, wrote to Hopi Agency Superintendent Miller, asserting Hopi rights to the 1882 reservation "though occupied by the Navajos."

At a special meeting of the Hopi Tribal Council, held at Oraibi on October 5, 1937, a resolution was passed to the effect that, for several stated reasons, the land management districts should not be recognized. One of these reasons was that " * * * the Hopi people have not conceded any part of their reservation to the Navajos."

At a conference between Commissioner Collier and fifteen Hopi Tribal Council members and four Hopi chiefs, held at Oraibi on July 14, 1938, the statement was made for the Hopis that they considered the Navajos on the reservation as trespassers, that the entire 1882 reservation belonged to the Hopis, and that to prevent any misunderstanding as to this the 1882 boundary lines should also be made the boundary lines of district 6.

On April 24 and 25, 1939, four Hopi leaders met in Washington with the Commissioner, at which time the Hopis presented a map showing the "sacred area" that the Hopi people desired. The map showed an area much larger than the 1882 reservation. But the Hopis also asked, as a bare minimum, that they be recognized as having exclusive rights in the entire 1882 reservation.[86]

85. Pertinent here is the following comment, documented by other instances of illegal Governmental rule on page 309 of the Handbook of Federal Indian Law by Felix S. Cohen, published in 1945: "Tribal possessory right in tribal land requires protection not only against private parties but against administrative officers acting without legal authority and against persons purporting to act with the permission of such officers. * * *"

86. This was one of many instances in which the Hopis, in addition to claiming all of the 1882 reservation, also laid claim to vast areas beyond that reservation. These so-called "traditional" claims are

explained, as Dr. Harold S. Colton reported to a Senate subcommittee on May 20, 1931, by a desire on the part of so-called "orthodox" Hopis to own or control the holy places and shrines where groups of Hopis had worshipped for centuries past.

These shrines are found from Navajo Mountain to the Little Colorado, and from the San Francisco Mountains to the Luckachukas. The Hopi village of Hotevilla, basing its position upon an ancient stone record in the possession of the village chief, apparently claimed the North American continent, from ocean to ocean.

While these claims to an extended area were based on Hopi tradition, the fact

Early in 1942, the Hopis sought to make a test case out of their disagreement with the practice of denying permits to district 6 Hopis for use of lands outside of district 6. At that time they submitted 105 applications by Hopi stockmen for grazing permits on range lands outside of district 6. Navajo Superintendent Fryer returned all of these applications "without action" on February 27, 1942.

Byron P. Adams, then Chairman of the Hopi Tribal Council, approved the Centerwall report of July 29, 1942. That report contained the statement that the setting aside of a land management unit for the Hopis does not create a reservation boundary and that the Hopis would remain entitled to all beneficial use, including the right to any proceeds, within the remainder of the 1882 reservation.

Commissioner Collier met with Hopi leaders at Oraibi on September 12, 1944, at which time the Hopi claims to the entire 1882 reservation were once more aired.

In April, 1945, the Hopi chiefs of the Second Mesa in the 1882 reservation protested to Senator Burton K. Wheeler against the fencing of district 6. At a meeting held on November 6–7, 1945, at the Tareva Day School, in the reservation, Hopi leaders in effect told officials of the Office of Indian Affairs that the Hopis continued to claim the 1882 reservation lands outside of district 6.

Perhaps these Hopi claims subsequent to the settlement of Navajos would have been even more persistent and vehement had it not been for the constant assurances given to them by Government officials, that their exclusion from all but district 6 was not intended to prejudice the merits of the Hopi claims.

It is true that, as a practical matter, the entirely valid settlement of Navajos in the part of the 1882 reservation outside of district 6, even without the illegal restraint which the Government placed upon the Hopis, would have greatly limited the amount of surface use the Hopis could have made of the outer reaches of the reservation. Though Hopi and Navajo rights of use and occupancy were equal, members of both tribes could not physically utilize the same tract at the same time. This was a hazard to which the Hopis were at all times subject because of the authority reserved in the Secretary to settle other Indians in the reservation.

But without such Governmental restraint and without Navajo pressure in becoming joint occupants there would unquestionably have been a substantial movement of Hopis into the area outside of district 6, which they presumably would have still been using and occupying on July 22, 1958. Moreover, with or without such restraint, the Hopi rights in subsurface resources were not affected, either as to legal standing or practical opportunity to exploit.[87]

Defendant calls attention to Article I of the Hopi Constitution, adopted by the Hopis on October 26, 1936, and approved by the Secretary on December 19, 1956. It appears to be defendant's view that Article I of that Constitution amounts to a voluntarily accepted limitation upon the jurisdiction of the Hopi Tribal Council, confining such jurisdiction to the area of the Hopi villages and such other lands as might be added thereto by agreement with the Government and the Navajo Indian Tribe.

In his opinion of February 12, 1941, the solicitor relied upon this and two

that claims based on ancient rites were made was by no means unique with the Hopis. It was common for Indian tribes to claim, on such grounds, an area of land much larger than their reservations. As a matter of fact the boundary claimed by the Navajos at one time extended to the city of Albuquerque, New Mexico and included the Jicarilla Apache Reservation.

87. See the opinion of acting solicitor Felix S. Cohen, dated June 11, 1946. 59 Dec. Dept. Int., 248.

other provisions of the Hopi Constitution as requiring disapproval of the proposed Secretarial order dividing the 1882 reservation into areas of Hopi and Navajo exclusive occupancy.[88]

We agree with the solicitor's conclusion. The Hopi Constitution does not itself provide an affirmative foundation for the Hopi claim to an interest in the entire reservation. It does, however, negate the contention that the Hopis had abandoned or otherwise surrendered their asserted rights therein.

We therefore conclude that neither before nor after the Secretarial settlement of Navajos, did the Hopis abandon their previously-existing right to use and occupy that part of the 1882 reservation in which Navajos were settled.

For the reasons stated above, Hopi rights of use and occupancy in that part of the reservation were not terminated by Congressional enactment, administrative action, or abandonment. This would appear to require the conclusion that the Navajo Indian Tribe does not have an exclusive interest in the part of the reservation in which it has been settled, but has only a joint, undivided, and equal interest therein with the Hopi Indian Tribe.

██ But defendant points out that, unless the Navajo Indian Tribe is held to have an exclusive interest in that part of the 1882 reservation lying outside of district 6, it will not be possible in this action to completely divide the reservation between Hopis and Navajos. Arguing that it was the purpose of Congress in passing the Act of July 22, 1958, to obtain such a division of the reservation, defendant urges us to fulfill this purpose by declaring that the Navajos have such an exclusive interest.

It was indeed the hope and probably the expectation of the Congressional sponsors of the legislation that this litigation would result in a clear-cut division of the reservation, leaving no undisposed issues.[89] Thus, at the hearing on June 18, 1958, before the House Committee on Interior and Insular Affairs, held on S. 692 and H.R. 3780, the then Congressman Udall stated that: " * * * it is either a matter of Congress attempting to determine the boundaries which would be an impossible situation, or having a judicial determination." [90]

But the fact that Congress hoped and expected that this litigation would put an end to the Navajo-Hopi controversy does not warrant the court in disregarding facts and law which dictate a different result. Congress appreciated this, as revealed by the language of the 1958 act, and its pertinent legislative history.

The act places no mandatory duty on this court to accomplish a complete division of the reservation, as between Hopis

88. See note 48 above, at the end of which this part of the solicitor's opinion is quoted.

89. The jurisdictional statute was first introduced on July 16, 1956, by Senator Goldwater, as S. 4086, 84th Cong. That bill passed the Senate but not the House. Similar measures were introduced in both the Senate and House in the 85th Congress. S. 692, 85th Cong., was introduced by Senators Goldwater and Hayden. H.R. 3789, 85th Cong., was introduced by Congressman Udall.

90. Later during this hearing the following colloquy occurred:
"Mr. Saylor. The next question is:
"Since the purpose of this bill is to determine the rights of both the Navaho and Hopi Tribes, does the committee expect there will be a division of the lands in question?
"Mr. Udall. The legislation so provides, that the Court will make determination where the boundary lies, and the lands that are determined to belong to the Navaho will go to the Navaho, and you will have a new boundary determined.
"Mr. Saylor. In other words, instead of the existence of this no-man's land we have right now, where both tribes do not know what their jurisdiction is, when the decision of the Court is arrived at there will be a section of it probably set aside for the Hopi and a certain section set aside for the Navaho?
"Mr. Udall. That is exactly the case."

and Navajos. Lands, "if any," in which the Navajo Indian Tribe or individual Navajo Indians are determined to have an exclusive interest are henceforth to be a part of the Navajo Indian Reservation. Lands, "if any," in which the Hopi Indian Tribe, including any Hopi village or clan thereof, or individual Hopi Indians are determined to have an exclusive interest are thereafter to be a reservation for the Hopi Indian Tribe. But there is no direction that all reservation lands must be classified as exclusively Navajo or exclusively Hopi, or that lands which were neither exclusively Navajo or Hopi must nevertheless be distributed to one tribe or the other.

This goal could have been realized if the bill had been enacted in its original form. Section 2 of the bill, as introduced, provided that:

" * * * (1) any lands in which the court finds that the Navaho Tribe or individual Navahos have the exclusive interest shall thereafter be a part of the Navaho Reservation, (2) any lands in which the court finds that the Hopi Tribe, village, clan, or individual has the exclusive interest shall thereafter be a reservation for the Hopi Tribe, and (3) any lands in which the Navaho and Hopi Indians have a joint or undivided interest shall become a part of either the Navaho or the Hopi Reservation according to the court's determination of fairness and equity. * * * "

Referring to section 2, as it was then worded, Hatfield Chilson, Assistant Secretary of the Interior, made this comment to Congressman Clair Engle, Chairman of the House Committee on Interior and Insular Affairs, in a letter dated February 26, 1957:

" * * * This provision will assure that one or the other of the tribes will have administrative juris-

diction over the land in the future, without prejudice, however, to the undivided interests." [91]

The department thus recognized that the court might find that some reservation lands were held jointly rather than exclusively by one tribe or the other. But since the bill, in its original form, provided for the distribution of jointly-held lands as well as exclusively-held lands, a complete division of the reservation would nevertheless have been attained. The distribution of the jointly-held lands, if any were found to be so held, would have been in the nature of a judicial partition of lands then vested by reason of the trust declaration under the first section of the act.

But then it was decided to delete the provision which would give the court power to distribute jointly-held land. This was accomplished by amending the bill to strike the third numbered clause contained in the above-quoted part of section 2 of the bill. The request for this revision came from the department, in a letter from Chilson to Honorable James A. Haley, Chairman of the subcommittee. The reason given for this deletion was as follows:

" * * * The purpose is to leave for future determination the question of tribal control over lands in which the Navahos and Hopis may have a joint and undivided interest. The two tribes feel that this question cannot be adequately resolved until the nature of their rights is adjudicated, and that the question is properly one for determination by Congress rather than by the courts. We agree with that position. Until the nature of the respective interests is adjudicated it is difficult to determine whether any part of or interest in the lands should be put under the exclusive jurisdiction of either tribe." [92]

---

91. Page 5 of House Report No. 1942, 85th Cong., 2nd Sess., dated June 23, 1958, to accompany S. 692, 85th Cong., (which became the Act of July 22, 1958).

92. Page 6 of House Report No. 1942.

It thus appears that the reference to "joint and undivided" interests was omitted not because the court was to be precluded from finding such interests. Rather, it was because of the feeling that if joint and undivided interests were found to exist, the court ought not to be given the further duty, under the deleted clause 3, to distribute such lands between the two reservations, "according to the court's determination of fairness and equity."

In Chilson's letter of March 19, 1957, the reason given why this additional function should not be placed upon the court was that the two tribes felt that, as to any joint and undivided interests found to exist, the question of a partition or other disposition thereof "is properly one for determination by Congress rather than by the courts." [93]

In commenting upon this amendment, Perry W. Morton, Assistant Attorney General, told the Senate Committee on April 1, 1957, while H.R. 3789, 85th Cong., was under consideration:

" * * * The very fact that the sentence now proposed to be deleted is in the bill assumes that there must be, possibly at least, some land in which these two organizations have a joint or undivided interest. If the court is to proceed upon the basis of exclusive occupancy, then how can there be a joint or undivided interest?" [94]

The applicable facts and law of this case do not permit of a declaration that one tribe or the other has the exclusive interest in all of the 1882 reservation; or that all of the 1882 reservation is divisible into areas of exclusive interest for one tribe or the other. The only part of the reservation which may be, and herein is, so classified is the district 6 area, as defined on April 24, 1943, the Hopi Indian Tribe having the exclusive interest therein. As to the remainder of

---

93. An explanation as to why the parties and the Department thought it would be better for Congress, rather than the court, to distribute lands found to be held jointly, was made by Lewis Sigler, Legislative Division, Office of the Solicitor, when he appeared before the House Committee considering H.R. 3789, 85th Cong., at a hearing held on April 2, 1957, as follows:

"Under the Department's present position, that is, the Solicitor's opinion of 1946, those rights are now vested in the Hopi Tribe, and in individual Navahos jointly. That may or may not be a correct conclusion as a matter of law. The Navaho Tribe, as I understand it, is now differing with that position, and asserting that the rights are not in the individual Navahos, but are in the tribe. The Hopis, however, are still insisting that whatever rights there are are in the individual Navahos, rather than the tribe. So that is one of the issues still in dispute.

"Because of that dispute, and because it is possible that the court might aware [sic] the surface to one group and the subsurface to another group, we propose omitting this sentence which would define what happens to the lands in which there are joint interests, if that happens to be the end result.

"I should indicate that was the suggestion of both Mr. Boyden as a representative of the Hopis, and Mr. Littell as a representative of the Navahos, that if there should be such joint interest adjudicated, then Congress ought to take another look at it to decide where to put the joint interests.

"I should indicate, in all fairness, that both the Navahos and the Hopis, I think, will contend there are no joint interests, they are exclusive one way or the other. But you cannot rule out the possibility there will be a decision of joint interest."

94. Lewis Sigler of the solicitor's office, appearing before the House Committee on April 15, 1957, also advised of the possibility that the court might find some joint-user. He told the committee:

"If the courts decide, of course, that there are exclusive rights in either group, then the two sentences that are left in the bill will take care of it. It is only in the event there is this split ownership adjudicated that the feeling was Congress ought to take a look at the nature of that split ownership before it decided which tribe would get the control."

the reservation, the Hopi and Navajo Indian Tribes have joint, undivided, and equal interests as to the surface and sub-surface including all resources appertaining thereto, subject to the trust title of the United States.

It is just and fair in law and equity that the rights and interests of the Hopi and Navajo Indian Tribes be determined in the manner just stated, and that the respective titles of the two tribes in and to the lands of the 1882 reservation be quieted in accordance with that determination.

It has been the consistent position of the defendant throughout this suit that the Navajo Indian Tribe has the exclusive interest in all of the 1882 reservation lying outside of the area described on page 2 of Pre-Trial Order No. 2. In that pre-trial order he also took the position that "No other interests were asserted" by defendant than those described. During the pre-trial hearing which led to the entry of Pre-Trial Order No. 2, counsel for defendant twice stated that defendant made no claim to a joint interest in any part of the reservation.

In our view, however, this disclaimer of any Navajo joint interest, does not preclude this court from judicially determining that the Navajo Indian Tribe has a joint interest in a part of the reservation, as we have concluded, if the facts and law warrant such a determination and do not permit an adjudication that the Navajo Indian Tribe has an exclusive interest in such part.

### Conclusion

Under the judgment being entered herein about one quarter of the 1882 reservation, consisting of district 6 as defined in 1943, will be completely removed from controversy, having been awarded exclusively to the Hopi Indian Tribe. As to the remainder of the reservation, the facts and law, as herein determined and applied, and our lack of jurisdiction to partition jointly-held lands, preclude a complete resolution of the Hopi-Navajo controversy.

But even as to this remaining part of the reservation in which the two tribes are herein held to have joint, undivided and equal rights and interests, the judgment will have the effect of narrowing the controversy. At least three crucial questions which have heretofore hampered a fair administration of this part as a joint reservation, or a division thereof by agreement or Congressional enactment, have now been settled. No longer will it be tenable for the Hopis to take the position that no Navajos have been validly settled in the reservation. No longer will it be tenable for the Navajos to take the position that they have gained exclusive rights and interests in any part of the reservation. No longer will there be uncertainty as to the boundaries of the area of exclusive Hopi use and occupancy.

It will now be for the two tribes and Government officials to determine whether, with these basic issues resolved, the area lying outside district 6 can and should be fairly administered as a joint reservation. If this proves impracticable or undesirable, any future effort to partition the jointly-held area, by agreement, subsequently-authorized suit, or otherwise, will be aided by the determination in this action of the present legal rights and interests of the respective tribes.

In the course of this opinion it has been necessary to say some unkind things about the activities of the Navajo Indians in the reservation area in years long past. We wish to make it clear that the record contains nothing concerning the conduct of the Navajos in this area in recent years with which they can be reproached. They as well as the Hopis are now conducting themselves as good citizens of which the West and the nation can be proud.